[No. 36384-1-I.    Division One.    May 5, 1997.]

PATRICK B. COX, JR., *Respondent*, v. THE KEG
RESTAURANTS U.S., INC., ET AL., *Appellants.*

240

*Jerrett E. Sale, E. Pennock Gheen, Robert J. Roche,* and

*Bullivant, Houser, Bailey, Pendergrass & Hoffman*, for appellants.

*Jonathan D. Sweigert, John D. Strauss, Eric B. Zimbelman*, and *Strauss & McDonald*, for respondent.

ELLINGTON, J. — On November 1, 1991, Patrick Cox and Philip Whalen each patronized The Keg Restaurant. After The Keg served Whalen 10 drinks in two and a half hours, he assaulted Cox without provocation and inflicted permanent brain damage. Cox brought suit against Whalen and The Keg, and introduced evidence of Whalen's blood alcohol content. The jury returned a verdict for Cox, finding Cox two percent at fault for failing to mitigate but not otherwise at fault, and assigning the remaining fault roughly equally between The Keg and Whalen.

The trial court found that Cox's failure to mitigate was not the type of fault that should preclude joint liability under the Tort Reform Act of 1986, and held The Keg and Cox jointly liable for 98 percent of Cox's damages. The Keg challenges this ruling and challenges the court's admission of blood alcohol content (BAC) evidence and its instructions to the jury. Cox cross-appeals, arguing that there was insufficient evidence for the jury to find failure to mitigate. We agree that the evidence was insufficient and therefore hold Whalen and The Keg each jointly and severally liable for Cox's entire damages, and remand for apportionment to The Keg and Whalen the fault erroneously assigned to Cox. On all other issues, we affirm.

*Facts/Procedure*

When Philip Whalen arrived at The Keg at approxi-

mately 9:00 p.m. on November 1, 1991, he had already consumed a double Bloody Mary. Whalen testified that during the next two and a half hours at The Keg, he ordered and consumed five shots of 100 proof whiskey and five beers, as well as a partial "electric iced tea." The Keg's computer drink-tracking system verified that shots of whiskey were served at 9:02, 9:33, 9:59, 10:17, and 11:23 p.m. Between 9:45 and 10:10 p.m., Whalen became irate and began banging on the pay phones. James Kollasch, The Keg's manager, asked Whalen to "take it easy." About 30 seconds later, Kollasch handed Whalen a mechanical pencil he had requested, which Whalen soon broke as he began banging on the phones again. Patron Shannon Seibel told Kollasch that Whalen was out of control and should be removed from the premises. According to Seibel, Kollasch said he knew Whalen was out of control and had had too much to drink. Kollasch did not remember this discussion, but did remember asking Whalen to leave. Kollasch also could not remember whether he told his staff that he had asked an intoxicated person to leave the premises. Seibel testified that he did not, but instead walked directly back to his office. Whalen apparently left as requested, but immediately returned. Seibel testified that she asked the bartender to inform Kollasch that Whalen had returned. The bartender did not recall this conversation. Whalen remained at The Keg.

At approximately 11:30 p.m., Whalen and Cox were both on the dance floor. Whalen began to antagonize Cox, at one point telling the disc jockey that Cox was "about to get his ass kicked." Whalen eventually pushed Cox, who pushed back and left the building. Whalen ran after Cox, catching up to him as he left the restaurant. He grabbed Cox from behind, knocked him to the ground, and repeatedly smashed his head onto the pavement. Cox was knocked unconscious. Whalen promptly left the scene. He later pleaded guilty to second degree assault.

Cox suffered brain damage, including permanent memory loss and aggravation of an existing but nonsymptom-

atic hydrocephalus condition.[1] Dr. Richard Winn installed a shunt in Cox's brain to drain excess fluid. Despite the shunt, Cox continues to experience headaches and fatigue. Winn testified that with a head injury such as Cox sustained, such symptoms could last for years.

At trial, Cox argued The Keg was liable for serving an obviously intoxicated person when it had notice of a possibility of harm. The Keg argued that Cox was negligent for provoking the incident, and had failed to mitigate his damages. The jury found Cox was two percent at fault for failing to mitigate, but was not otherwise at fault, that The Keg's negligence caused 45 percent of Cox's damages, and that Whalen caused the remaining 53 percent.

After the verdict, Cox argued that the defendants should be held jointly and severally liable. The Tort Reform Act of 1986 generally precludes the imposition of joint and several liability when the party suffering injuries was "at fault." *See* RCW 4.22.070. The Act defines fault as including unreasonable failure to mitigate damages. *See* RCW 4.22.015. The court reviewed these statutes and concluded that a failure to mitigate could not rationally be considered as a type of fault on the part of plaintiff which would preclude joint liability. The court therefore held the defendants jointly and severally liable for 98 percent of Cox's damages. Cox and The Keg appeal.

### Joint Liability and the Sufficiency of the Mitigation Evidence

The central questions on appeal surround the issue of joint and several liability. We find that there was insufficient evidence to present a jury question on failure to mitigate. Without such evidence there was no basis to as-

---

[1]Hydrocephalus involves the accumulation of cerebral spinal fluid in the brain.

sign fault to Cox, and The Keg is jointly liable with Whalen for Cox's damages.

*Sufficiency of Evidence – Failure to Mitigate*

Cox argues that there was insufficient evidence to create a jury question on failure to mitigate, and that because he was not otherwise at fault, liability is joint and several. With this proposition we agree.

An injured party generally may not recover damages proximately caused by that person's unreasonable failure to mitigate. *Sutton v. Shufelberger*, 31 Wn. App. 579, 582, 643 P.2d 920 (1982); *see* RCW 4.22.015. Expert testimony is required in cases where a determination of causation turns on obscure medical factors. *Bruns v. Paccar, Inc.*, 77 Wn. App. 201, 214, 890 P.2d 469, *review denied*, 126 Wn.2d 1025, 896 P.2d 64 (1995). Submitting the issue to the jury without such testimony is improper because the jury is thus invited to reach a result based on speculation and conjecture. *See Savage v. State*, 127 Wn.2d 434, 448-49, 899 P.2d 1270 (1995). The issue should also not be submitted if the evidence shows that a proposed treatment might not be successful or if there is conflicting testimony as to the probability of a cure, because it is not unreasonable for a plaintiff to refuse treatment that offers only a possibility of relief. *See generally*, 22 Am. Jur. 2d *Damages* § 540 at 620-21 (1988). The party asserting an unreasonable failure to mitigate bears the burden of proof. *Young v. Whidbey Island Bd. of Realtors*, 96 Wn.2d 729, 734, 638 P.2d 1235 (1982). Because The Keg presented no witness of its own on this issue, it relies entirely on the testimony of Cox's treatment providers.

The Keg first argues that Cox's unreasonable failure to mitigate is demonstrated by his refusal to have his shunt removed or restructured as recommended by his physiatrist, Dr. Evan Cantini. But Cantini only testified that he felt that it might have been useful to consider revising or eliminating the shunt and that he discussed shunt revi-

sion as a treatment option. He did not testify to a reasonable degree of medical certainty that revision or elimination was necessary or would alleviate Cox's headaches. Moreover, Cantini stated that he was not an expert in evaluating hydrocephalus and deferred to Cox's neurosurgeon, Dr. Richard Winn, who testified that it was reasonable to decline a shunt revision. Winn further testified that removing the shunt would aggravate the hydrocephalus and that he would need "strong evidence" to determine that the shunt was over-draining before he would recommend a revision. Winn refused to make a judgment as to whether it was probable that a shunt revision would eliminate Cox's headaches and testified that with a moderate head injury like Cox's, symptoms of dizziness, fatigue and headache could last for years.

The Keg next claims that Cox failed to mitigate his damages because he did not take anti-depressants or begin physical therapy as recommended by Cantini. But again, Cantini did not testify to a reasonable degree of medical certainty that these refusals prolonged Cox's recovery. Instead, Cantini only affirmed defense counsel's suggestion that "it might [have] hasten[ed Cox's] recovery if he had followed through on [these] recommendations[.]" A mere possibility of benefit is insufficient.

The Keg also contends that Cox's unreasonable failure to mitigate is demonstrated by his delay in seeking speech therapy. In August 1992, Cantini recommended that Cox see a speech therapist to develop compensatory strategies to deal with his memory loss. Cox did not consult a speech therapist, however, until February 1994. But Cantini did not testify that this delay prolonged Cox's recovery. Instead, he testified only that Cox could possibly have benefited by engaging in therapy earlier. The speech therapist testified that the treatment, once undertaken, did not in fact improve Cox's memory or cognitive abilities. And there was no testimony that Cox's delay was unreasonable. Dr. Thomas Green, a neuropsychologist, testified that Cox was depressed and in massive denial about

his depression in 1992. Green further testified that this depression and denial were normal responses to the trauma Cox suffered and that overcoming such feelings can take years.

The Keg next argues that Cox's failure to seek psychotherapy on Dr. Green's advice evidences his failure to mitigate. But as Green himself recognized, the value of such therapy is speculative. Green testified that only one-third of psychotherapy patients improve as the result of therapy, while one-third get worse and one-third show no improvement. With regard to Cox, Green stated only that he "would like to think that [psychotherapy] would have helped."

The Keg finally argues that Cox unreasonably failed to mitigate his damages because he did not return to work. There is no evidence to support this contention. Cox attempted to work part time at his landscaping job for nearly one and a half years, after which Dr. Cantini declared Cox disabled. Cantini testified that Cox would not be employable without a comprehensive rehabilitation program, which would cost between $5,000 and $30,000, and even then, his employability remained only a possibility. The Keg presented no contrary evidence.

■■ None of the evidence cited by The Keg amounts to substantial evidence of an unreasonable failure to mitigate. The Keg points only to evidence of possibilities. We have independently reviewed the record and conclude it is devoid of any evidence that was sufficient. The court therefore erred in submitting the mitigation issue to the jury. Since the jury found no other fault on Cox's part, Whalen and The Keg are jointly and severally liable for Cox's damages. *See* RCW 4.22.070.

Cox suggests that in the interest of judicial economy, the two percent fault erroneously attributed to him should be proportionally distributed to the tortfeasors. The Keg has provided no argument to the contrary. We therefore remand for entry of judgment against Whalen and The Keg for 100 percent of Cox's injuries, jointly and sever-

ally, with the trial court to reach an appropriate apportionment upon notice to Whalen.

### Cox's Alternative Arguments Regarding Fault

Cox alternatively argues that the court's imposition of joint liability was proper even in light of the jury's allocation of fault to him. Cox notes that the definitional statute[2] was not amended when the Tort Reform Act[3] was adopted, that when read together the statutes are ambiguous,[4] and that especially when considered in light of traditional common law principles, the combined history

---

[2]In part, the definitional statute provides:

"Fault" includes acts or omissions, including misuse of a product, that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability on a product liability claim. The term also includes breach of warranty, unreasonable assumption of risk, and unreasonable failure to avoid an injury or to mitigate damages. Legal requirements of causal relation apply both to fault as the basis for liability and to contributory fault.

RCW 4.22.015 (enacted 1981).

[3]The relevant statute provides, in part:

In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages . . . . The entities whose fault shall be determined include the claimant or person suffering personal injury . . . . Judgment shall be entered against each defendant . . . in an amount which represents that party's proportionate share of the claimant's total damages. The liability of each defendant shall be several only and shall not be joint except:

. . . .

(b) If the trier of fact determines that the claimant or party suffering bodily injury or incurring property damages was not at fault, the defendants against whom judgment is entered shall be jointly and severally liable for the sum of their proportionate shares of the claimant's total damages.

RCW 4.22.070 (originally enacted 1986; amended 1993).

[4]For example, the definitional statute governs "comparison of fault for any purpose under RCW 4.22.005 through 4.22.060," while the joint and several liability provision is found in RCW 4.22.070. The fault definition states that "[l]egal requirements of causal relation apply both to fault as the basis for liability and to contributory fault." RCW 4.22.015. But failure to mitigate is not a "contributory fault" under traditional analysis. The mitigation doctrine is a damages rule, not a negligence rule. *See generally* RESTATEMENT (SECOND) OF TORTS § 918(1) cmt. 2 (1986); *but see Clark v. Payne*, 61 Wn. App. 189, 192, 810 P.2d 931, *review denied*, 117 Wn.2d 1022, 818 P.2d 1099 (1991).

of the definitional statute and the Tort Reform Act reveals a legislative intent to retain joint liability when the plaintiff's only fault was a failure to mitigate.

Cox also alternatively argues that The Keg should be held jointly liable because the act does not permit apportioning fault to intentional tortfeasors. *See Price v. Kitsap Transit*, 125 Wn.2d 456, 464, 886 P.2d 556 (1994). Moreover, Cox argues that even if such apportioning is appropriate in some circumstances, it is not appropriate here because The Keg owed Cox an affirmative duty of protection. *Martin v. U.S.*, 779 F. Supp. 1242, 1251-52 (N.D. Cal. 1991).

We do not reach these issues, because our ruling on the sufficiency of the evidence renders them moot.

## Other Issues

### Admission of BAC Testimony

The Keg argues that the court erred in admitting expert testimony of Whalen's blood alcohol content. We find no error.

A drinking establishment may be liable for a criminal assault if the establishment served an obviously intoxicated person when it had some notice of the possibility of harm based on that person's prior actions. *Christen v. Lee*, 113 Wn.2d 479, 491, 780 P.2d 1307 (1989). Over The Keg's objection, Cox called Carol Murren, a forensic scientist, who testified that Whalen's probable blood alcohol content was 0.20 at the time of the assault. Relying mainly on *Christen*, The Keg argues that the BAC evidence was irrelevant to whether Whalen was obviously intoxicated or whether The Keg had notice of a possibility of harm.

The *Christen* court held that the results of a blood alcohol test were not sufficient to prove obvious intoxication where there was no other evidence that the defendant was visibly intoxicated. The court did not consider whether BAC evidence could ever be probative of obvious

intoxication, but held only that it is insufficient standing alone:

> Whether a person is obviously intoxicated or not is to be determined by the person's appearance to others around him or her at the time the intoxicating liquor is furnished to that person. Evidence of the amount of alcohol consumed is not sufficient by itself to establish that a person was furnished intoxicating liquor while obviously intoxicated.

113 Wn.2d at 487.

The court in *Christen* relied upon its earlier decision in *Purchase v. Meyer*, 108 Wn.2d 220, 223, 737 P.2d 661 (1987), wherein the court enunciated the rationale for requiring evidence of an intoxicated appearance rather than just blood alcohol content:

> In *Purchase*, we articulated several reasons why resort must be had to evidence of a person's appearance in order to determine whether that person was obviously intoxicated. First, we noted that a furnisher of intoxicating liquor ordinarily has no way of knowing how much alcohol a person has consumed before entering the establishment. Next, we observed that a person who is a heavy drinker may be legally intoxicated yet still not appear intoxicated. Finally, we explained that there are medically recognized variables in the way that alcohol may react on the human body.

113 Wn.2d at 489 (footnotes omitted). The Supreme Court recently declined to address the issue of whether BAC evidence could ever be considered as probative of obvious intoxication. *Kelly v. Falin*, 127 Wn.2d 31, 42 n.4, 896 P.2d 1245 (1995).

■■ Admission of relevant evidence is reviewed for abuse of discretion. *State v. Luvene*, 127 Wn.2d 690, 706-07, 903 P.2d 960 (1995). Evidence is relevant if it makes a fact in issue more likely. ER 401. The key question here is whether Whalen appeared to be intoxicated. The BAC evidence is direct evidence of the *fact* of intoxication. As to the *appearance* of intoxication, numerous individuals testified on this point. In addition to Seibel, Kollasch, and

Whalen, these witnesses included bartender Jeff Mantzke, who testified that Whalen was so intoxicated that he would not serve him (although The Keg's drink tracking records document that Mantzke sold two of Whalen's shots); disc jockey Timothy Davis, who testified that Whalen was "really drunk" when he told Davis that Cox was "about to get his ass kicked"; Hector Rancinos, who testified that Whalen was drunk when he was antagonizing Cox; Janine Orban, who testified that she saw Whalen drinking out of shot glasses most of the evening and that from the first time she saw him she could "tell [that] he was getting a good buzz"; and Robert Stevenson, who testified Whalen appeared intoxicated an hour before the assault. The BAC evidence was relevant to enhance the credibility of these observations. The trial court also afforded The Keg latitude to cross-examine Murren as to the relationship between BAC and obvious intoxication, and to argue this theory to the jury. In this context, the evidence was relevant, and its admission was within the discretion of the trial court.[5]

### Denial of Directed Verdict

■ The Keg next argues that the court erred in denying its motion for a directed verdict. A motion denying a directed verdict will be reversed only if no reasonable inferences from the evidence would permit a jury to find for the nonmoving party. *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 132, 769 P.2d 298 (1989). Here, The Keg contends that the evidence provided no reasonable inferences that Whalen was served when he was obviously intoxicated, or that a causal relationship existed between Whalen's intoxication and his violent conduct. *See generally Christen*, 113 Wn.2d at 488. As to

---

[5]We note that even if the introduction of this evidence were presumed erroneous, reversal would not be appropriate because, given the wealth of other evidence, Murren's testimony could not have, within a reasonable probability, affected the verdict. *See Stiley v. Block*, 130 Wn.2d 486, 498-99, 925 P.2d 194 (1996); *Brown v. Spokane County Fire Protection Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983).

Whalen's obvious intoxication, the evidence was strong, as has been discussed above. As to inferences permitting a jury to find a connection between his intoxication and his violence, the evidence was ample.

Seibel observed Whalen yelling and banging on the phone approximately 90 minutes before the assault. She described him as "taking and slamming the phones really hard, like he was furious"; "he sounded very drunk"; "he seemed dangerous, kind of vio[lent]—very violent at the time." Kollasch confirmed this behavior and considered Whalen to be borderline intoxicated. Whalen testified he "was a little tipsy" when he interacted with Kollasch at the phone booths. The Keg served as many as three shots of whiskey and three beers after Whalen's unruly behavior was observed by the manager. The evidence gives rise to an inference that The Keg served Whalen while he was visibly intoxicated and had notice of a possibility of harm. Further, the fact that Whalen had never even met Cox before—yet assaulted him without provocation—supports an inference that the assault was causally related to Whalen's intoxication. The court correctly denied the directed verdict motion.

### Jury Instructions

The Keg further argues that the court erred by failing to instruct the jury that the assault must have been a foreseeable consequence of serving Whalen alcohol when he was obviously intoxicated. We find no error in the instructions.

Jury instructions are adequate if they allow a party to argue its case, are not misleading, and properly state the law. *Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 616-17, 707 P.2d 685 (1985). Here, the contested instruction asked the jury whether Cox had proved "[t]hat [T]he Keg served alcohol to defendant Whalen . . . at a time when Whalen was obviously intoxicated" and that "[T]he Keg had notice of the possibility of violent conduct

and subsequent harm to other patrons by Whalen before or at the time of such service of alcohol to Whalen."[6] Thus, the instruction required Cox to prove that The Keg had notice of the possibility of harm when serving an obviously intoxicated person. This instruction accurately apprised the jury of The Keg's duty. *See Christen*, 113 Wn.2d at 496. The issue of foreseeability is implicitly explained by virtue of the "notice" and "obviously intoxicated" elements that define this duty. The instructions therefore correctly stated the law and were adequate to allow both parties to argue their cases.

### RAP Violations, Motion to Strike and Sanctions

The Keg moved to strike portions of Cox's reply brief that it contends are improper and has requested sanctions. *See* RAP 10.1(c), 10.3(c), 10.7. The improper briefing does not merit imposition of sanctions, and the motion is otherwise moot because we have not considered the alleged improper argument in our resolution of this appeal. We therefore deny the motion.

Affirmed in part, and remanded for reapportionment of the defendants' joint and several liability.

WEBSTER and BECKER, JJ., concur.

Review denied at 133 Wn.2d 1012 (1997).

---

[6]The instruction reads:

In order to establish negligence by the defendant Keg for serving alcohol to defendant Whalen, the plaintiff has the burden of proving each of the following:

(1) That the defendant Keg is engaged in the commercial sale of alcohol (this element is not in dispute);

(2) That the Keg served alcohol to defendant Whalen on or about November 1, 1991, at a time when Whalen was obviously intoxicated;

(3) That the Keg had notice of the possibility of violent conduct and subsequent harm to other patrons by Whalen before or at the time of such service of alcohol to Whalen.