Dale V. GREENWOOD, Appellant,

v.

Jason MITCHELL, Appellee.

No. 99–0644.

Supreme Court of Iowa.

Jan. 18, 2001.

Erik A. Luthens of Luthens Law Offices, P.C., West Des Moines, for appellant.

Edward G. Parker of Morain, Burlingame & Pugh, P.L.C., West Des Moines, for appellee.

TERNUS, Justice.

The appellant, Dale Greenwood, was struck by a vehicle being driven by the appellee, Jason Mitchell, as Greenwood was walking on a sidewalk in Des Moines, Iowa. In a subsequent suit filed by Greenwood against Mitchell, the jury found Greenwood to be sixty percent at fault based on his failure to mitigate his damages. Because Greenwood was more than fifty percent at fault, the district court entered judgment in favor of the defendant. *See* Iowa Code § 668.3(1)(*a*) (1999)[1] (providing that a plaintiff who "bears a greater percentage of fault" than the defendant is barred from any recovery). The trial court rejected the plaintiff's motion for new trial. We hold there was not sufficient evidence to submit the issue of the plaintiff's failure to mitigate to the jury. Therefore, we reverse and remand for retrial.

I. *Background Facts.*

On December 12, 1995, a vehicle driven by Mitchell struck Greenwood on his right side as Greenwood attempted to dive out of the way of the Mitchell vehicle as it left the street and careened onto the sidewalk. Greenwood experienced pain in his right arm and shoulder and left leg immediately after the accident. He was examined in the emergency room of a local hospital and conservative treatment was ordered.

When conservative treatment did not alleviate Greenwood's complaints, he was referred to an orthopedist, Robert Breedlove, M.D. Dr. Breedlove diagnosed Greenwood as having "chronic impingement syndrome, right shoulder secondary to motor vehicle accident." On May 10, 1996, upon Dr. Breedlove's recommendation, Greenwood had an "operative arthroscopy and decompression of his shoulder" on an outpatient basis.

Greenwood's post-operative course was uneventful and approximately three weeks post-surgery Dr. Breedlove released Greenwood to light duty. He also referred Greenwood to a physical therapist to begin

---

1. This action was filed in December 1997. The General Assembly amended chapter 668 during the 1997 legislative session, and these amendments were made applicable to claims filed after July 1, 1997. *See* 1997 Iowa Acts ch. 197, § 16. The amendments were codified in the 1999 Iowa Code. Therefore, all statutory citations are to the 1999 Code.

a range-of-motion and strengthening regimen.

At the initial therapy evaluation, the physical therapist concluded that Greenwood suffered from decreased range of motion and strength. He set two goals for Greenwood: (1) equal strength and motion in his shoulders; and (2) a pain-free state. In June 1996, Greenwood's physical therapist released Greenwood from treatment and advised him to continue with a home exercise program. Dr. Breedlove allowed Greenwood to return to full work duty as of July 1, 1996, noting that Greenwood was experiencing only occasional discomfort.

In June 1997, Greenwood returned to Dr. Breedlove for reevaluation of his right shoulder. He complained that for the past six months he had "noticed continued discomfort [when] lifting heavy objects ... and [when] doing push–ups and general physical therapy." He also complained of occasional arm numbness and weakness. Dr. Breedlove referred Greenwood to a second physical therapist, Thomas Bower, for further testing and an impairment rating.

During Greenwood's initial visit with Bower, Bower outlined Greenwood's medical history as it related to the right shoulder problem. In pertinent part, Bower's records state:

> This gentleman did reasonably well following the decompression *but apparently was not given any good home program of exercise.* Mr. Greenwood is employed by the Iowa National Guard and apparently through some of the physical conditioning requirements had to do a number of push-ups which have inflamed his shoulder once again.

(Emphasis added.) Bower further stated:

> We have discussed Mr. Greenwood's problem and I have given him a couple of exercises that should help decrease some of the discomfort that he is experiencing in the shoulder.... We believe this gentleman has sustained no greater than a 10% impairment to the right upper extremity based on those findings. We are hopeful that through exercise that this pain will reduce, although he is still very likely going to be limited in some activities overhead.

On follow-up with Dr. Breedlove, the doctor "felt that [Greenwood] was significantly better than he was preoperatively, but that he may always have constant irritation with respect to his right shoulder." Dr. Breedlove did not impose any physical restrictions on Greenwood and advised Greenwood to see him in the future on an as-needed basis.

In August 1998 Greenwood saw his family physician after he strained his *left* shoulder while lifting some heavy radios at work. The doctor noted that Greenwood "continues to have pain and stiffness in his right shoulder."[2]

II. *Legal Proceedings.*

In December 1997 Greenwood filed suit against Mitchell seeking damages for the injuries he sustained in the accident of December 1995. Mitchell answered, claiming that his actions were not a proximate cause of any of Greenwood's injuries. The case was set for trial on February 1, 1999. On the morning of trial, the defendant admitted fault for the accident, but continued to deny that the accident was a proximate cause of Greenwood's injuries.

At trial, the defendant sought to establish that Greenwood had failed to follow the home therapy regimen recommended by his first physical therapist. Greenwood testified as follows on cross-examination:

> Q. And at that time, [the therapist] discontinued your physical therapy, didn't he? A. Yes, because he was moving.

**2.** The record also contained evidence that in late 1996 Greenwood aggravated or reinjured his right shoulder during the course of his duties with the Iowa National Guard. Because these incidents are not relevant to the mitigation issue addressed on appeal, we omit any extended discussion of the evidence with respect to them.

Q. And he told you that he was doing that because all of your goals were met, didn't he? A. What he told me, if I remember right, was you don't really have to come back, you're doing good. I'm moving. Just keep up what you can at home.

Q. In other words, he instructed you on a home exercise program, didn't he? A. Yes.

Q. He told you to follow that, didn't he? A. Yes.

. . . .

Q. Now, it's my understanding that you were given home exercise instructions by the physical therapist. Do you recall that? A. Yes.

Q. And they told you to do that, remember that? A. Yes.

Q. They said if you got any pain or any problems doing your home exercise program, that will help you. Do you recall that? A. Yes.

Q. And in fact, Dr. Breedlove even wrote you a letter after the surgery, didn't he, told you the same thing? A. Yes.

Q. And he said, I'll trust that you [will] follow your home exercise program. Do you recall that? A. Yes.

Q. But you haven't been very consistent about doing that, have you? A. *I did it for quite a while and when I felt like it wasn't doing any good, I quit.*

Q. So you haven't been very consistent with it then, have you? A. No, I haven't.

(Emphasis added.)

Mitchell also testified at trial. He admitted he was at fault for the accident, but denied actually hitting Greenwood with his car.

The only other witness called by the defendant was Dr. Peter Wirtz, an orthopedic surgeon who had conducted an independent medical examination of Greenwood at the defendant's request. Dr. Wirtz testified that Greenwood had a "loss of motion of the right shoulder," but that the strength on both sides of his shoulders was normal. Dr. Wirtz was of the opinion that Greenwood had a four percent impairment of his right upper extremity as a result of the 1995 accident.

In discussing the impingement problem in Greenwood's right shoulder and the consequences of the decompression surgery, Dr. Wirtz testified:

A. Well, maximum healing time for this type of problem usually runs around six to 12 weeks, and at that point, once you've got this type of impairment or problem or you might need to have some medical problems in the future, need some care, and *past that point, it really wouldn't change that much.*

(Emphasis added.) As a final direct examination question, defense counsel queried:

Q. Would physical therapy or any other therapy be of assistance to Mr. Greenwood if he has problems *in the future?* A. Well, at this point, one would say that formal therapy probably isn't indicated. One would say he do a home exercise program and learn the exercise position and activities and do that *if that is needed.*

(Emphasis added.)

At the close of evidence, the court submitted proposed instructions to the parties. Greenwood objected to the instructions concerning his alleged failure to mitigate. Greenwood's counsel asserted there was not substantial evidence in the record to support submission of this issue. The court overruled Greenwood's objections and the failure-to-mitigate issue was submitted to the jury.

The verdict form to be completed by the jurors contained special interrogatories addressing fault, proximate cause, allocation or percentage of fault, and the amount of damages. Because Mitchell had admitted fault, the interrogatory concerning his fault was answered "yes" prior to the instructions being given to the jury.

Upon completion of their deliberations, the jurors returned a verdict in which it found both parties at fault and found both to be a proximate cause of damage to Greenwood. The jury also determined that Greenwood was sixty percent at fault and that Mitchell was forty percent at fault. Consequently, pursuant to the court's instructions, the jury did not answer the special interrogatory concerning the amount of the plaintiff's damages. The court then entered a judgment in favor of the defendant.

Greenwood filed a motion for new trial raising two issues pertinent to this appeal. He first contended that the defendant had not introduced substantial evidence to justify submission of the failure-to-mitigate instructions. *See* Iowa R. Civ. P. 244(h) (permitting a new trial where an error of law occurred in the proceeding "materially affect[ing] the] movant's substantial rights"). The plaintiff argued that medical testimony was necessary to establish that his failure to do home exercises resulted in injury. The defendant responded that it was only necessary to prove that the plaintiff did not follow his health care provider's recommendations.

The second ground supporting Greenwood's motion for new trial was his assertion that the jury's verdict was not reconcilable with the evidence, in that any failure to mitigate on the part of the plaintiff occurred more than six months after the accident. *See* Iowa R. Civ. P. 244(f) (permitting a new trial where the verdict is not supported by sufficient evidence and the movant's substantial rights were materially affected). The defendant argued that this result was appropriate under the comparative fault statute because the legislature had included failure to mitigate in the statutory definition of fault. *See* Iowa Code § 668.1(1) (defining "fault" to include an "unreasonable failure to avoid an injury or to mitigate damages"). Thus, according to the defendant, the plaintiff's failure to mitigate must be compared to the defendant's fault as to *all* damages.

The court denied the plaintiff's request for a new trial. It ruled that medical testimony was not needed to support a failure-to-mitigate claim with respect to medical damages. The court also concluded that the comparative fault statute allows for the result the jury reached in this case:

> We don't draw a distinction between what all the damages were and what all the pain and suffering were up until the time [the plaintiff] decides not to do his home exercises. Maybe we should, but that's not [what] the statute says.

The plaintiff appealed, contending error in the trial court's denial of his motion for new trial. The case was transferred to the court of appeals, which affirmed the district court. We granted further review. Because we find the alleged instructional error to be dispositive, we do not consider the plaintiff's claim that the verdict was not sustained by sufficient evidence.

### III. *Scope and Standard of Review.*

■ "A party is entitled to have an adverse decision vacated and a new trial granted if errors of law occurred in the proceedings." *Iowa Mut. Ins. Co. v. McCarthy,* 572 N.W.2d 537, 544 (Iowa 1997) (citing Iowa R. Civ. P. 244(h)). Here, the plaintiff claims that the trial court erred in submitting instructions on failure to mitigate. We review this claim for correction of legal error. *See id.* at 545.

■ A trial court "must refuse to instruct on 'an issue having no substantial evidential support or which rests on speculation.'" *Thompson v. City of Des Moines,* 564 N.W.2d 839, 846 (Iowa 1997) (quoting *Clinton Land Co. v. M/S Assocs., Inc.,* 340 N.W.2d 232, 234 (Iowa 1983)). "Substantial evidence is that which a reasonable person would find adequate to reach a conclusion." *Bredberg v. Pepsico, Inc.,* 551 N.W.2d 321, 326 (Iowa 1996). In

determining the sufficiency of the evidence, we give the evidence "the most favorable construction possible in favor of the party urging submission." *Hoekstra v. Farm Bureau Mut. Ins. Co.*, 382 N.W.2d 100, 108 (Iowa 1986).

## IV. Sufficiency of Evidence to Support Submission of Failure to Mitigate.

■ As noted earlier, Iowa's comparative fault statute defines "fault" to include an "unreasonable failure to avoid an injury or to mitigate damages." Iowa Code § 668.1(1). Because much of the Iowa statute is taken directly from the Uniform Comparative Fault Act, this court has held that "[t]he official comments to the Uniform Act have some persuasive influence in determining what our legislature intended by the language in our comparative fault act." *Coker v. Abell–Howe Co.*, 491 N.W.2d 143, 148 (Iowa 1992). The official comment to the definition-of-fault section refers to the phrase "unreasonable failure to avoid an injury or mitigate damages" as another way of including "the doctrine of avoidable consequences." *Id.* at 149 (citing Unif. Comparative Fault Act § 1, cmt., 12 U.L.A. 44, 45 (Supp.1992) (now found at 12 U.L.A. 128 (1996))). Under the avoidable consequences doctrine, "a party cannot recover damages that result from consequences which that party could reasonably have avoided." *Id.* (citing 22 Am.Jur.2d *Damages* § 495, at 579 (1988)). In *Coker*, we distinguished the avoidable consequences doctrine from the doctrine of contributory negligence as follows:

Like contributory negligence, avoidable consequences is the review of the reasonableness of the plaintiff's conduct as a defense in a negligence action. Both doctrines examine the plaintiff's duty to care for his own interests and require the plaintiff to exercise only the standard of care of the reasonable person under the circumstances. Yet, contributory negligence and avoidable consequences are distinct:

[C]ontributory negligence is negligence of the plaintiff before any damage, or any invasion of his rights, has occurred.... The rule of avoidable consequences comes into play after a legal wrong has occurred, but while some damage may still be averted, *and bars recovery only for such damages.*

*Id.* (emphasis added) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 65, at 458 (5th ed.1984) [hereinafter "*Prosser on Torts*"] ).

■ Having established the nature of a failure-to-mitigate claim, we now turn to a discussion of the proof necessary to support submission of such a claim. Initially, there must be substantial evidence that there was something that the plaintiff could do to mitigate his loss and that requiring the plaintiff to do so was reasonable under the circumstances. *See Tanberg v. Ackerman Inv. Co.*, 473 N.W.2d 193, 196 (Iowa 1991). Furthermore, it must be shown that the plaintiff acted unreasonably in failing to undertake the mitigating activity. *See* Iowa Code § 668.1(1) (defining "fault" as an "*unreasonable* failure ... to mitigate damages" (emphasis added)); *Shewry v. Heuer*, 255 Iowa 147, 155, 121 N.W.2d 529, 534 (1963) ("[A]n injured person is under no absolute obligation to follow the advice of his physician in order to minimize his damages. His duty in this respect is to use ordinary care in the matter of following such advice."); *Kirk v. Union Pac. R.R.*, 514 N.W.2d 734, 737 (Iowa App.1994) ("[T]he defendant has the burden of demonstrating that the failure to mitigate was unreasonable under the circumstances."). Finally, there must be proof of a causal connection between the plaintiff's failure to mitigate and his damages. *See* Iowa Code § 668.1(2) ("The legal requirements of cause in fact and proximate cause apply both to fault as the basis for liability and to contributory fault."); *id.* § 668.3(3) ("In determining the percentages of fault, the trier of fact shall consider both the nature

of conduct of each party *and the extent of the causal relation between the conduct and the damages claimed."* (Emphasis added.)); *Fuches v. S.E.S. Co.,* 459 N.W.2d 642, 643 (Iowa App.1990) ("In order to find a failure to undergo medical treatment was a failure to mitigate damages, there must be a showing that such treatment would in fact have mitigated the damages."). The burden rests on the defendant to prove the plaintiff's failure to mitigate. *See Tanberg,* 473 N.W.2d at 196.

Upon our review of the record, we conclude the defendant has failed to introduce substantial evidence to prove that Greenwood's failure to continue his home exercise program was unreasonable. We also think there is insufficient evidence to establish a causal connection between Greenwood's failure to mitigate and his damages.

As noted in our review of the factual and legal background of this case, Greenwood's first physical therapist prescribed a home exercise program upon Greenwood's completion of physical therapy in June 1996. Greenwood testified he followed the program "for quite a while," but quit when he felt "it wasn't doing any good." The defendant's expert medical witness testified that at a point between six to twelve weeks post-surgery, Greenwood's condition "really wouldn't change that much." When asked about physical therapy in the future, the expert testified that Greenwood could do a home exercise program "if that is needed."

Conspicuously absent from the record is any testimony that Greenwood's failure to continue his home exercise regimen in perpetuity was unreasonable. Nor is there any expert testimony that Greenwood's continuation of home exercises would have prevented certain damages.

The defendant relies on a letter from physical therapist Bower to Dr. Breedlove in which Bower states he has given Greenwood "a couple of exercises that *should* help decrease *some* of the discomfort" and that while he is "*hopeful* that through exercise ... this pain will reduce, [Greenwood] is still very likely going to be limited in some activities overhead." We think this testimony is too uncertain to support submission of the defendant's failure-to-mitigate claim. *See Cox v. Keg Restaurants U.S., Inc.,* 86 Wash.App. 239, 935 P.2d 1377, 1380 (1997) (holding that a mere possibility that physical therapy would benefit the plaintiff was not sufficient to support a failure-to-mitigate defense). Under this state of the record, the jury was left to speculate whether any part of Greenwood's damages was proximately caused by his own inaction and, if so, what portion could have been avoided.

The defendant also relies on an entry in records of the original physical therapist that states the goals of therapy had been accomplished upon Greenwood's release from physical therapy. Those goals were equal strength and motion in Greenwood's shoulders and a pain-free state. The defendant argues that the jury could conclude from this evidence that if Greenwood had continued his home exercises, he would have had no continuing problems. We do not think this inference can be drawn without the assistance of expert testimony. It is equally possible that the recurrence of shoulder problems is a natural consequence of the plaintiff's injury, or that his subsequent problems were such that home exercise would not have completely alleviated them. Simply stated, the defendant's case lacked expert testimony that Greenwood's subsequent symptoms were caused by his failure to follow his home exercise program. *See Cox,* 935 P.2d at 1380 (holding there was insufficient evidence to submit issue of failure to mitigate based on plaintiff's refusal to begin physical therapy where there was no expert medical testimony based on a reasonable degree of medical certainty that this refusal prolonged the plaintiff's recovery).

In asserting that the evidence in this case was adequate to support submission of the plaintiff's alleged failure to mitigate, the defendant relies on three prior appel-

late decisions in which the evidence was held to be sufficient to allow the jury to consider whether the plaintiff had failed to mitigate his damages. *See Tanberg,* 473 N.W.2d at 196; *McDonnell v. Chally,* 529 N.W.2d 611, 614 (Iowa App.1994); *Miller v. Eichhorn,* 426 N.W.2d 641, 643 (Iowa App.1988). The primary focus in *Tanberg* and *McDonnell* was whether a failure to lose weight as advised by the plaintiff's treating physician could be the basis for a failure-to-mitigate claim. *Tanberg,* 473 N.W.2d at 195; *McDonnell,* 529 N.W.2d at 613. In *Miller,* the court held without elaboration that "testimony by one of [the plaintiff's] doctors that additional chiropractic treatments would have helped [her] condition" supported submission of the mitigation-of-damage issue. 426 N.W.2d at 643. Although the appellate courts in each case determined that the evidence was sufficient to support submission of the defendant's claim, the dispute in these cases did not center on the sufficiency of the evidence with respect to the causal connection between the plaintiff's conduct and the plaintiff's damages, the primary matter at issue here.

■ To the extent these cases are inconsistent with our evaluation of the defendant's burden of proof on a failure-to-mitigate claim, they are overruled. We see no principled distinction between the defendant's burden to prove a causal connection between the plaintiff's failure to mitigate and the plaintiff's damages, and the plaintiff's burden to prove that the defendant's fault was a proximate cause of the plaintiff's damages. If expert medical testimony is required to establish a causal link between fault and damages in one situation, such testimony should be equally required in the other. In other words, the standard of proof is no less exacting when the defendant alleges the plaintiff caused his own damages than it is when the plaintiff alleges that the defendant caused the plaintiff's damages.

Because the defendant did not introduce substantial evidence that the plaintiff's ac-

tions were unreasonable or that his actions were a proximate cause of an identifiable portion of his damages, the trial court erred in submitting the instructions on failure to mitigate. This error materially affected the plaintiff's substantial rights as shown by the fact that the adverse verdict rested on the jury's assessment of fault to the plaintiff. Therefore, the plaintiff was entitled to a new trial based on this error. The trial court erred in failing to grant the plaintiff's motion for new trial.

### V.  *Issues on Retrial.*

It is possible that on retrial the defendant will introduce the necessary testimony to support submission of his failure-to-mitigate defense. Therefore, we briefly address the problem that occurred in the first trial when the jury was allowed to allocate the plaintiff's fault against all of the plaintiff's damages. We initially note our disagreement with the defendant's position that the legislature intended to change the nature of the failure-to-mitigate defense so as to make it applicable to *all* of a plaintiff's damages. As our opinion. today makes clear, this defense is based on conduct occurring *after* the plaintiff has sustained an injury caused by the defendant's fault. Moreover, the defendant must prove a causal connection between the plaintiff's fault and the plaintiff's damages.

Cases in which failure to mitigate is an issue will, therefore, almost always present a situation in which some portion of the plaintiff's damages will not be subject to the failure-to-mitigate claim. The present case is a perfect example. The plaintiff's alleged failure to mitigate did not arise until at least six months after his injury. The only defense offered to this initial period of damages was a denial of proximate cause, an issue resolved by the jury adversely to the defendant. Despite the fact that the plaintiff suffered damages for a minimum of six months that were proximately caused by the defendant's fault, the plaintiff recovered nothing. Contrary to

the district court's conclusion in its ruling on the plaintiff's motion for new trial, we do not think that the comparative fault statute requires that the jury ignore the distinction between the damages sustained prior to the alleged failure to mitigate and those sustained during the time the plaintiff failed to mitigate his damages. To the contrary, a comment to the definition of "fault" in the Uniform Comparative Fault Act notes that there is a "requirement of a causal relation for the *particular* damage." Unif. Comparative Fault Act § 1, cmt., 12 U.L.A. 128 (1996) (emphasis added) (giving as an example the fact that "negligent failure to fasten a seat belt would diminish recovery only for damages in which the lack of a seat belt restraint played a part, and not, for example, to the damage to the car"); *see also* Iowa Code § 668.3(3) (requiring jury to consider the causal connection between a party's fault and the plaintiff's damages in determining allocation of fault).

We think the inequitable result of the first trial can be avoided upon retrial by the use of separate verdict forms for the period prior to the plaintiff's alleged failure to mitigate and for the period that includes the plaintiff's alleged failure to mitigate. Nothing in the comparative fault statute requires that an allocation of fault be made in one verdict form in cases such as this, where the failure-to-mitigate claim is easily identifiable to a specific time frame. *See generally Prosser on Torts* § 65, at 459 (stating in discussion of doctrine of avoidable consequences that "courts have been willing to apportion damages to separate causes when a logical basis may be found" for doing so). We do not suggest that separate verdict forms are necessary in every case in which failure to mitigate is alleged as a defense. The practicality of using separate verdict forms in a particular case and the extent to which separate verdict forms would assist the jury in rendering a verdict consistent with the evidence is best left to the judgment of the trial court.

## VI. *Conclusion.*

The trial court erred in submitting the defendant's failure-to-mitigate claim to the jury. The plaintiff is entitled to a new trial. Therefore, we vacate the court of appeals' contrary decision, reverse the district court's judgment in favor of the defendant, and remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED.**