[Nos. 57821-9-I; 57321-7-I;  Division One.  January 7, 2008.]
57320-9-I.

BIANCA FAUST, *Individually and as Guardian*, ET AL., *Respondents*, v. MARK ALBERTSON, *as Personal Administrator*, ET AL., *Defendants*, BELLINGHAM LODGE No. 493 ET AL., *Appellants*.

---

[27] *Willie*, 941 F.2d at 1391; *Padilla*, 819 F.2d at 956 n.1.

274

*Russell C. Love* (of *Thorsrud Cane & Paulich*) and *William E. Fitzharris, Jr.* (of *Preg O'Donnell & Gillett, PLLC*) *Edward M. Kay* and *Paul V. Esposito* (*Clausen Miller, PC*, of counsel), for appellants.

*Philip A. Talmadge* (of *Talmadge Law Group, PLLC*) and *Steven J. Chance*, for respondents.

¶1 APPELWICK, C.J. — After they were injured when their vehicle was struck by a drunk driver, the Fausts brought suit against the estate of the driver, who was killed in the accident. They also sued Alexis Chapman, bartender at the Moose Lodge, and the Moose Lodge itself for overservice of alcohol. The jury returned a verdict for the Fausts. Chapman and the Moose Lodge appeal. The Fausts cross-appeal, contending that the interest rate on tort judgments violates their constitutional right to equal protection. Liability for overservice of alcohol requires that the consumer appear under the influence at the time of service. The evidence does not support overservice. We reverse and vacate the judgment against Chapman and the Moose Lodge and deny the cross-appeal.

### Facts

¶2 At approximately 7:45 p.m. on April 21, 2000, while driving southbound down LaBounty Road in Ferndale, Hawkeye Kinkaid's[1] van wandered across the center line and struck a northbound vehicle head-on. The car held the Faust family. Bianca Faust was driving the car, which also contained her children, Bianca Celestine Mele and Gary

---

[1] Except where necessary, in quoting the record, we use the correct spelling of Kinkaid throughout this opinion.

Christopher Faust, and her infant granddaughter. Bianca Faust suffered a broken kneecap and other injuries. Bianca Mele broke both of her wrists and a femur and also received lacerations and a knee injury. Of the car passengers, Christopher suffered the most serious injuries, resulting in paraplegia. Kinkaid sustained severe injuries, resulting in massive bleeding that required administration of significant amounts of fluid to replace the lost blood. He later died at the hospital.

¶3 One hour after the accident, toxicology showed that Kinkaid's blood alcohol content (BAC) was 0.16 percent, significantly above the legal limit of 0.08 percent.[2] At autopsy, Kinkaid's BAC was 0.09 percent after losing significant amounts of blood and receiving large quantities of fluids. The medical examiner also explained that Kinkaid's stomach contents included 1.5 liters of liquid that smelled strongly of alcohol. This alcohol had not yet been absorbed into his bloodstream and was therefore not reflected in the BAC analyses. The Fausts' forensic science consultant testified that at the time of the accident, Kinkaid's BAC was approximately 0.32 percent. In order to achieve this level, the expert calculated that Kinkaid needed to consume 21 12-ounce containers of beer or 30 ounces of 80-proof alcohol.

¶4 On the evening of the accident, Kinkaid had been at the Moose Lodge in Bellingham where his girl friend, Alexis Chapman, was the bartender. The Faust family filed suit against Hawkeye Kinkaid's estate; the Bellingham Moose Lodge; Moose International, Inc.; and Chapman as employee and bartender at the Moose Lodge in Bellingham. The suit alleged that Kinkaid negligently injured the Fausts, that the Moose Lodge and Chapman overserved alcohol to Kinkaid, that the Moose Lodge negligently hired

---

[2] The initial analysis was done on a plasma sample, with a result of 0.16 percent. The legal standard for intoxication is based on whole blood BAC. The expert estimated Kinkaid's initial whole blood BAC was 0.14 percent based on a conversion that assumes 16 percent difference between plasma and whole blood BAC levels.

and supervised Chapman, and that Moose International failed to adequately monitor the Moose Lodge and Chapman. Moose International was dismissed from the case during trial. The parties stipulated to a judgment against Kinkaid's estate.

¶5 Testimony showed that Kinkaid and Chapman arrived at the Moose Lodge at about 4:30 p.m. According to Chapman, who had spent the afternoon with Kinkaid, he was sober upon arrival at the Moose Lodge. Chapman testified that she served Kinkaid only two beers. Members of the Moose Lodge who remembered seeing Kinkaid at the Moose Lodge that night testified that he appeared to be sober. The parties dispute the time of Kinkaid's departure from the Moose Lodge. The Fausts presented evidence that he left the bar around 7:30 p.m., including Chapman's original statement to an investigator. Other witnesses testified that Kinkaid left around 6 p.m. Two witnesses testified that they had seen Kinkaid drinking a beer at a bowling alley after 6 p.m., but the bartender at that establishment stated that Kinkaid had not been in the bar that night.

¶6 A jury returned a verdict for the Fausts and awarded significant damages, totaling approximately 14 million dollars. In apportioning negligence among the defendants, the jury attributed 50 percent to Kinkaid, 15 percent to Chapman, and 35 percent to the Moose Lodge. The Moose Lodge and Chapman (collectively Lodge) appeal.

*Discussion*

I. Overservice of Alcohol

A. *Requirements for Liability for Overservice of Alcohol*

¶7 The Lodge moved for a judgment as a matter of law during and after trial and also moved for a new trial based on insufficiency of evidence as to overserving.

[A] challenge to the sufficiency of the evidence, or a motion for nonsuit, dismissal, directed verdict, new trial, or judgment notwithstanding the verdict, admits the truth of the opponent's

evidence and all inferences which can reasonably be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in a light most favorable to the opponent.

*Davis v. Early Constr. Co.,* 63 Wn.2d 252, 254, 386 P.2d 958 (1963). In reviewing a ruling on a motion for a judgment as a matter of law, we engage in the same inquiry as the trial court. *Stiley v. Block,* 130 Wn.2d 486, 504, 925 P.2d 194 (1996). A judgment as a matter of law requires the court to conclude as a matter of law "that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party." *Indus. Indem. Co. of Nw., Inc. v. Kallevig,* 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990). However, the court must "defer to the trier of fact on issues involving conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence." *State v. Hernandez,* 85 Wn. App. 672, 675, 935 P.2d 623 (1997). Overturning a jury verdict is appropriate only when the verdict is clearly unsupported by substantial evidence. *Burnside v. Simpson Paper Co.,* 123 Wn.2d 93, 107, 108, 864 P.2d 937 (1994). Because the standards of review and the issues are the same as in the trial court, this section will discuss whether the trial court erred in its denial of motions for both judgment as a matter of law and the motion for a new trial.

¶8 Civil liability for overservice of alcohol arises from the fact that "a commercial host has a statutory duty to refrain from serving persons 'apparently under the influence of liquor.'" *Barrett v. Lucky Seven Saloon, Inc.,* 152 Wn.2d 259, 273, 96 P.3d 386 (2004) (quoting RCW 66.44.200(1)). "This duty is a limited exception to the general rule that it is not a tort to sell alcohol to 'ordinary able-bodied men' on the theory that it is the drinking of the alcohol that is the proximate cause of any injury, not the furnishing of it." *Dickerson v. Chadwell, Inc.,* 62 Wn. App. 426, 434, 814 P.2d 687 (1991) (quoting *Halvorson v. Birchfield Boiler, Inc.,* 76 Wn.2d 759, 762, 458 P.2d 897 (1969)). The exception arises because "[o]nly when a commercial establishment furnishes liquor to one 'in such a

state of helplessness or debauchery as to be deprived of his will power or responsibility for his behavior' does applicability of this proximate cause rationale cease." *Id.* (citations omitted) (quoting *Halvorson,* 76 Wn.2d at 762).[3] Thus, the duty applies only to service of alcohol to those already exhibiting manifestations of the effect of alcohol.

¶9 The Lodge contends that the Fausts needed to provide direct, observational evidence that Kinkaid was "apparently under the influence" at the time Chapman served him. The Fausts disagree, claiming that blood alcohol evidence can prove that a person is apparently under the influence of alcohol. The Washington Supreme Court has indicated its concern "that blood alcohol content be used only as evidence of intoxication at the time of the accident and not as evidence of the obviousness of intoxication at the time of alcohol service." *Dickinson v. Edwards,* 105 Wn.2d 457, 463, 716 P.2d 814 (1986). As a result of this concern, the court determined that "[w]hen the obviousness of intoxication is at issue, firsthand observations and other circumstances from which such obviousness can be inferred are most valuable to the court." *Id.* "Whether a person is obviously intoxicated or not is to be determined by the person's appearance to others around him or her at the time the intoxicating liquor is furnished to that person." *Christen v. Lee,* 113 Wn.2d 479, 487, 780 P.2d 1307 (1989).

¶10 Despite these clear pronouncements, the court has permitted cases to go forward from summary judgment based on direct observation evidence of obvious intoxication at the time of the accident, rather than service, *see Dickinson,* 105 Wn.2d at 464; *Fairbanks v. J.B. McLoughlin Co.,* 131 Wn.2d 96, 929 P.2d 433 (1997). In *Dickinson,* the court considered statements of the investigating officer who

---

[3] "Obviously intoxicated" was the common law standard for overservice. The Washington Supreme Court has determined that RCW 66.44.200 establishes an "apparently under the influence of liquor" standard. *Barrett,* 152 Wn.2d at 274-75. Cases prior to *Barrett* refer to the "obviously intoxicated" standard but the required evidence does not appear to have changed. *See, e.g., Christen v. Lee,* 113 Wn.2d 479, 487, 780 P.2d 1307 (1989); *Purchase v. Meyer,* 108 Wn.2d 220, 223, 737 P.2d 661 (1987).

observed the defendant's behavior a mere 10 minutes after the conclusion of one banquet where he had consumed 15 to 20 drinks in three and one-half hours. 105 Wn.2d at 464-65. The court reversed the summary judgment because "subjective observations of obvious intoxication made in close time proximity to the period of alcohol consumption may raise an inference of obvious intoxication upon which to base a material question of fact." *Id.* at 464. Similarly, in *Fairbanks,* a police officer's firsthand observations of the defendant's slurred speech and staggering raised an inference about her intoxication when served since she did not consume alcohol after leaving the premises and no time remained unaccounted for between consumption of the beverages and the observation. 131 Wn.2d at 103.

¶11 Such inferences create fact evidence of over-consumption that raise issues of material fact as to a defendant's condition upon service sufficient to defeat summary judgment. But, the Supreme Court has limited the use of this postconsumption evidence to factually unique cases where "the very close time proximity of service of alcohol to when the driver was seen obviously intoxicated following the accident." *Purchase v. Meyer,* 108 Wn.2d 220, 227-28, 737 P.2d 661 (1987). The inferences are not sufficient to prove the statutory standard of service to someone "apparently under the influence of liquor," nor to allow consideration of other corroborating evidence, like BAC. Cases lacking observational evidence have not survived summary judgment. *See Purchase,* 108 Wn.2d at 226 (results of observations of behavior and BAC taken hours after service of alcohol did not establish overservice when nothing in the record suggested defendant appeared intoxicated at the bar); *Christen,* 113 Wn.2d at 488-89 ("neither the results of a blood alcohol test nor the appearance of a person a substantial time after the intoxicating liquor was served constitutes sufficient evidence of obvious intoxication"). Absent observational evidence that the drinker appeared under the influence of alcohol when served, a plaintiff cannot establish overservice by a preponderance of the

evidence. Where this observational evidence is lacking, a directed verdict is appropriate. Evidence of appearance of intoxication at the time of the subsequent accident, including BAC, cannot be considered in the absence of evidence of the appearance of being under the influence at the time of service. BAC is merely relevant to enhance the credibility of observations about the defendant's condition at the time of service. *Cox v. Keg Rests. U.S., Inc.,* 86 Wn. App. 239, 250, 935 P.2d 1377 (1997).

¶12  The current statutory standard is "apparently under the influence of liquor." "Apparently under the influence of liquor" means "seemingly" drunk, as opposed to the higher standard of "unmistakably" or "certainly" drunk. *Barrett,* 152 Wn.2d at 264, 268. " '[E]vidence of the amount of alcohol consumed is not sufficient by itself to establish that a person was furnished intoxicating liquor while [apparently under the influence].' " *Id.* at 279 (quoting *Christen,* 113 Wn.2d at 487). Thus to meet the legal standard, the plaintiffs needed to present evidence concerning whether Kinkaid was "seemingly" drunk at the time Chapman served him alcoholic beverages. If evidence does not show that Kinkaid appeared intoxicated to those around him, the evidence is insufficient to raise an issue of fact as to overservice. *Christen,* 113 Wn.2d at 490.

### B. *Evidence Presented at Trial*

██  ██  ¶13 The trial court denied the motions for judgment as a matter of law and new trial. In its posttrial ruling the trial court stated:

> In this case, the court's previous ruling that the statements of Alexis Chapman, the bartender at the Moose Lodge, was sufficient evidence of behavior evidencing that Hawkeye Kincaid was apparently under the influence of liquor reflects the determination by the court that the person serving the alcohol directly to Kincaid, who has a personal knowledge of him and his behavior, is well placed to observe those behaviors. Those statements provide sufficient evidence to take the case to the jury for determination as to liability.

According to the trial court, the statements Chapman made to Rainy Kinkaid, Hawkeye Kinkaid's daughter, and Lisa Johnston provided adequate evidence. "In these statements, it was declared that Hawkeye Kincaid had too much to drink or was drunk, shouldn't have been driving, and should have been cut off from further service. It is for the jury, then, to decide from these statements whether or not the last service of alcohol, based on the bartender's familiarity with Hawkeye Kincaid, was over-service." The court also found the "evidence of Hawkeye Kincaid's blood alcohol level was not the sole evidence on which the jury's decision is based, but merely supporting evidence." However, the trial court did admit that "[w]ithout the statements of the bartender Chapman, Defendants' motion would be granted." Based on this statement, the trial court relied heavily on the testimony of Rainy and Lisa Johnston about Chapman's comments in order to deny the motions for a defense verdict.

¶14 Rainy testified that Chapman admitted to her that Kinkaid was drunk.

A: That he was at the bar, and they were having an argument or not getting along or however you want to say it, and pretty much either she kicked him out or didn't want him there or told him to leave.

Q: And did she describe his condition when she told him to leave?

A: Yeah, she knew that he was tipsy, that he shouldn't be behind the wheel.

Q: What did she say to you?

A: She said that he had too much to drink, and shouldn't be driving.

Rainy also testified that Chapman made similar comments at a later date.

Q: [T]he second time that she talked to you, did she again indicate what his condition was when he left the Moose Lodge?

A: Yes.

Q: And what did she tell you the second time?

A: That he had been drinking for quite awhile.

Q: And what did she say in terms of his ability to operate a vehicle?

A: Drunk.

While Rainy's testimony appears damning for Chapman, the questions center on Kinkaid's condition when he *left* the Lodge. The statute does not impose liability for allowing a drunken patron to leave the premises regardless of whether he is cut off, thrown out, or leaves voluntarily. Rainy's testimony about Chapman's admissions do not show that she *served* Kinkaid when he was "apparently under the influence of liquor," only that he was intoxicated upon his departure. The statements do not fix Chapman's perception of Kinkaid's condition at the appropriate time to establish liability for overservice.

¶15 Similarly, Johnston's testimony about Chapman's statements does not establish Kinkaid's appearance to others around him at the time of service. Chapman apparently revealed that Kinkaid had been drunk to Johnston, a friend of Kinkaid and bouncer at the bar where Chapman had been employed as a bartender.

Q: [D]id you ever talk to her about what happened that evening?

A: Yes.

Q: What did she tell you?

A: She said that Hawkeye was sitting at the bar and he was being obnoxious and that he was drunk, and she cut him off and he got mad.

Q: And then what happened after she cut him off and he got mad?

A: He left. . . .

Q: And you're certain, though, that she did tell you that he—she knew he was drunk?

A: Yes.

Once again, this testimony shows Kinkaid's condition after he had consumed alcohol, not when Chapman served the

beverages. The statements provide *no insight into whether* Kinkaid had been "apparently" under the influence when he was served. Instead, the testimony describes Kinkaid's drunken condition after he had been drinking. Nothing says he was drunk when he got there so that any service would have been overservice. In addition, the statements support responsible behavior by Chapman—she cut him off when he became drunk and obnoxious. This suggests that Chapman recognized signs of drunkenness and refused to serve him, as required by law.

¶16 The evidence relied upon by the trial court to deny a defense verdict does not appear to meet the standard required for liability based on a claim of overservice. This liability requires specific point-in-time evidence establishing "that person's appearance at the time the intoxicating liquor is furnished to the person." *Purchase,* 108 Wn.2d at 223. Here, both Rainy and Johnston testified that Chapman admitted that Kinkaid was drunk when he *left* the Moose Lodge. This does not prove overservice. The trial court erred by relying on Chapman's statements, as related by Rainy and Johnston, as sufficient evidence to forestall a directed verdict. This evidence is not sufficient to establish Kinkaid's appearance at the time of service of alcohol. Because "[t]he purpose of this provision is to protect against foreseeable hazards resulting from service to an intoxicated person," the duty applies only to the service of alcohol to those already exhibiting signs of the influence of alcohol. *Dickerson,* 62 Wn. App. at 435. The Lodge cannot be held liable when a patron is not "apparently under the influence" when served. As long as Chapman did not serve Kinkaid after he "appeared" under the influence, neither she, nor the Lodge, are liable for the Fausts' injuries. Since no evidence describes Kinkaid's state when Chapman served him, substantial evidence does not support the jury verdict against the Lodge for overservice.

¶17 We reverse the verdict against the Lodge on liability for overservice. As a result, we must also reverse the negligent hiring/supervision claim against the Lodge since it is based

on Chapman's negligent overservice. The verdict and judgment against the estate of Hawkeye Kinkaid remains.

## II. Constitutionality of RCW 4.56.110(3)

¶18 The Fausts requested and received a 6.002 percent interest rate on their judgment. They agree that this interest rate is consistent with RCW 4.56.110(3), which awards interest on tort judgments at

> two percentage points above the equivalent coupon issue yield, as published by the board of governors of the federal reserve system, of the average bill rate for twenty-six week treasury bills as determined at the first bill market auction conducted during the calendar month immediately preceding the date of entry.

For the first time on appeal, the Fausts challenge the constitutionality of RCW 4.56.110(3) because the statute applies a different rate of interest to tort judgments than to other judgments. They base the challenge on both federal and state equal protection grounds.

¶19 Under both the federal and state constitutions, "[t]he right to equal protection guarantees that person is similarly situated with respect to a legitimate purpose of the law receive like treatment." *State v. Harner,* 153 Wn. 2d 228, 235, 103 P.3d 738 (2004). The Fausts contend the judgment interest statute violates equal protection because it punitively applies a lower interest rate to tort judgments than to contract or child support judgments. However, "[a] statute is presumed to be constitutional, and the party challenging its constitutionality bears the burden of proving its unconstitutionality beyond a reasonable doubt." *State v. Thorne,* 129 Wn.2d 736, 769-70, 921 P.2d 514 (1996). The parties agree that the statute is subject to rational basis review. "[U]nder the rational basis standard the law must be rationally related to a legitimate state interest, and will be upheld unless the classification rests on grounds wholly irrelevant to the achievement of a legitimate state objective." *DeYoung v. Providence Med.*

*Ctr.,* 136 Wn.2d 136, 144, 960 P.2d 919 (1998). This " '[standard] is the most relaxed and tolerant form of judicial scrutiny under the equal protection clause.' " *Id.* (internal quotation marks omitted) (quoting *State v. Heiskell,* 129 Wn.2d 113, 124, 916 P.2d 366 (1996)).

¶20 Both parties cite to House Bill report for (H.B.) 2485, which discusses the reasoning behind the bill.

[I]nterest on judgments should reflect to some degree economic reality at the time a judgment is entered. The current rate makes considerations of interest charges alone drive decisions on whether to appeal a case. Interest charges on a judgment against a local government can grow to hundreds of thousands of dollars while a case is being appealed. The bill will let appeal decisions be made more on the merits of the case itself.

H.B. REP. on H.B. 2485, at 3, 58th Leg., Reg. Sess. (Wash. 2004).

¶21 This legislative report shows a clear purpose—to align interest on tort judgments with the economy at judgment and help ensure that decisions to appeal are based on merit, rather than concern about the growth of a judgment due to interest. These are legitimate government interests; therefore, the statute is constitutional "unless the classification rests on grounds wholly irrelevant to the achievement of a legitimate state objective." *DeYoung,* 136 Wn.2d at 144. The Fausts provide no evidence that the new method of determining the interest rate on tort judgments does not contribute to the achievement of the legitimate government objective. Instead, the Fausts merely argue that the statute is "punitive" because it requires a lower interest rate on tort judgments. As a result, the Fausts do not meet their burden of proof that the statute is unconstitutional beyond a reasonable doubt. The statute does not violate equal protection law.

¶22 We reverse and vacate the verdicts against Chapman and the Lodge. We deny the cross appeal.

ELLINGTON, J., and COLEMAN, J. PRO TEM., concur.

Review granted at 164 Wn.2d 1025 (2008).