# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ERIK T. SALISBURY and THERESA SALISBURY, | No. 82474-1-I (consolidated with No. 84341-9-I) |
| Appellants, | |
| v. | DIVISION ONE |
| CITY OF SEATTLE, a municipal corporation; and JEFF SPONG, an individual, | PUBLISHED OPINION |
| Respondents. | |

BIRK, J. — This appeal arises out of a personal injury claim brought by former police officer Eric Salisbury against the city of Seattle (City) for an injury Salisbury sustained while on duty, which the parties tried to verdict. We address three issues. First, we conclude Salisbury presented sufficient evidence supporting claims for past and future economic damages for the issue to be decided by a jury. Second, we clarify the standards governing a defense of failure to mitigate in personal injury claims. And third, we conclude, consistent with controlling case law, that all of Salisbury's claimed damages, including general damages, are subject to offset for received and receivable Washington Law Enforcement Officers' and Firefighters' Retirement System Act (LEOFF), chapter 41.26 RCW, benefits. We affirm in part, reverse in part, and remand.

Citations and pin cites are based on the Westlaw online version of the cited material.

No. 82474-1-I/2

I

Officer Erik Salisbury was hired to work for the Seattle Police Department in 1985, when he was 21 years old. Over more than 30 years with the department, Salisbury was eventually assigned to the highly sought-after Harbor Patrol Unit. He worked a 24 hour "firefighter" shift, which allowed ample opportunity to pursue interests outside of work and put in over time. Salisbury called it "a fun job," and an "adventurous job" where he was certified as a scuba diver, and drove a variety of boats including a 49 foot twin turbo diesel jet engine boat. Salisbury described gaining deep gratification from his work and stated, "I was able to help, save, rescue more people in my time at harbor than I ever had in patrol." Salisbury also described enjoying the camaraderie between police officers, saying, "It's something that . . . a lot of my friends don't have with their coworkers, with their peers, being able to share stories with each other" and share the burdens unique to police work that he did not want to expose his wife to.

On April 10, 2018, Salisbury was working as a firearms instructor for the Seattle Police Department when a trainee accidently discharged a round that ricocheted off the ground, causing a bullet fragment to enter Salisbury's lower right leg. The fragment entered near Salisbury's knee, traveled downward nine inches through his soft tissue, and lodged next to his bone midway down his tibia, where it remains. The City admitted that the trainee was negligent when he discharged his firearm and that the City was vicariously liable for this negligent act.

Salisbury went to Harborview Medical Center. Salisbury's pain grew steadily worse following the shooting, and he has experienced pain since that day.

2

No. 82474-1-I/3

The pain would not stop "at any time, night or day."  Salisbury began treatment for the pain with Dr. Gary Schuster on April 19, 2018.

Salisbury testified, "I hoped I was going to get back.  That was my dream. . . . I didn't want to move on.  I hoped I was going to get better."  Salisbury initially attempted to return to work for a 10 day period shortly after the shooting.  Salisbury described experiencing agonizing pain while standing on a harbor patrol boat and being limited in his movements.  Salisbury testified, "I wasn't feeling comfortable or confident with my abilities to support myself, which means I won't be able to support somebody that needs my help."

In addition to his physical symptoms, Salisbury began experiencing difficulty sleeping and having nightmares and distressing thoughts about getting shot.  He first considered the possibility of leaving the Police Department when he realized he was having trouble interacting with others.  Salisbury described a particularly distressing incident where a colleague likened him to a character from the movie, *One Flew Over the Cuckoo's Nest*.[1]  Following that incident, Salisbury left work, and did not return.

Salisbury began meeting with a clinical psychologist, Dr. Oscar Benitez, on July 30, 2018.  Salisbury was diagnosed with posttraumatic stress disorder (PTSD) and adjustment disorder with depressed mood, both attributed to the accidental shooting.  The treatment plan was cognitive behavioral therapy, which Dr. Benitez described as "the gold standard for approaching both depression and PTSD."

---

[1] United Artists 1975.

3

When Salisbury's physical symptoms persisted into November 2018, Dr. Schuster prescribed a drug "originally designed as an antiseizure medication, but could possibly treat nerve-generated pain."

On April 1, 2019, Dr. Schuster attested that Salisbury was permanently incapacitated from gainful activity. Salisbury officially retired from the Seattle Police Department due to his leg injury on May 31, 2019. Salisbury testified that he thinks of being a police officer again every day, but that he knows he cannot.

As of June 9, 2020, Salisbury reported that his pain was "constant," and varied "from ignorable to more noticeable." Salisbury reported that his pain increased with activity, including driving, and that he uses a walking stick. Salisbury rated his pain at "7-8/10" following a one mile walk on an uneven trail. At that time, Salisbury was also having significant drug side effects. Though Dr. Schuster had lowered Salisbury's dose the side effects continued. Dr. Schuster told Salisbury to stop taking the medication. While the medication helped "the neuropathic pain, . . . taking it was not worth the side effects. It was just masking the discomfort and was not curing the problem." At that time, Dr. Schuster assessed that Salisbury had "significant posttraumatic residuals," and that he had "no expectation" for further improvement.

Salisbury and his wife, Theresa Salisbury, brought a lawsuit against the City and the trainee who accidentally shot Salisbury, for tort damages. Because the City admitted liability, the only issue at trial was the determination of damages.

On June 27, 2020, in preparation for trial, Salisbury was examined by the City's witness, Dr. Jennifer James. Dr. James testified that there were no objective

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82474-1-I/5

findings supporting Dr. Schuster's opinion that Salisbury had experienced nerve damage. Dr. James requested a special CT (computed tomography) scan with three-dimensional reconstruction of Salisbury's right leg. Dr. James offered an alternate diagnosis, and testified that she was "100 percent confident that he has peripheral arterial disease in his right leg."

At trial, Salisbury presented evidence of past and future economic loss including a statement showing that his average monthly income for the 12 month period before the accident was $15,933.95. Salisbury testified that he worked in excess of 40 hours virtually every week, including working in the training unit in over time. Salisbury testified that his base salary increased "in the 1 to 5 percent range per year." Dr. Schuster assessed that Salisbury was "totally incapacitated for any substantial gainful activity." The City admitted that Salisbury's "injuries from the incident more probably than not disabled him from performing the required job duties of a Seattle police officer from the time of the incident through at least June 1, 2020." Salisbury was 54 years old at the time of the incident, and he testified that he did not have any plans to retire at the time of the incident and that he "could certainly see progressing [to] early, mid, late 60s."

At the conclusion of the Salisburys' case in chief, the City moved to dismiss "any claim for future economic loss in the form of lost wages *or however the plaintiff may want to characterize it*." (Emphasis added.) The City argued, "[T]here is no sufficient evidence in this record in the plaintiffs' case from which a jury, without speculation, could award future economic damages." The court granted this motion, stating, "Exactitude is certainly not required, but a trier of fact may not be

5

invited to engage in speculation or conjecture, and that is where this jury would be left were I to allow these claims to go forward." A day later, while the parties were discussing jury instructions, the court extended this ruling to past economic damages as well. Referring to the earnings statement Salisbury had offered, the court reiterated that "[t]he single data point would require the jury to engage in speculation, guess, or conjecture."

During the City's case in chief, the manager of Absence Management of the Seattle Department of Human Resources, Heather Krueger, testified that Salisbury received benefits "as a result of his [LEOFF] claim[2]" associated with his injury. Krueger testified that, to the date of the trial, the City had paid Salisbury $157,448.29 in time loss payments. Krueger described these payments as "a partial income replacement that is provided to workers who have been injured or sustained an illness on the job and have an allowable claim." Krueger testified that Salisbury would be eligible to receive further benefits for permanent partial disability and vocational rehabilitation services.

At the close of trial, over the Salisburys' objection, the trial court gave a failure to mitigate instruction on the remaining claims for noneconomic damages. The court stated that because "the remaining causes of action are for noneconomic damages, it's not possible to segregate a precise amount." To support the instruction, the City cited evidence that Salisbury did not engage in vocational rehabilitation assistance offered by the City, engage in an exercise regimen, or

---

[2] Krueger referred to "[w]orkers' [c]ompensation" benefits. The parties agree that Salisbury received these benefits under LEOFF.

seek a second opinion on the peripheral arterial disease diagnosis made by Dr. James. The City cited evidence that the Salisburys had not engaged in couple's counseling. The City also argues that Salisbury unreasonably delayed treatment for his injury, unreasonably delayed treatment with a therapist, and unreasonably declined to pursue medication and alternate therapy strategies.

The jury returned a verdict of $1,280,000.00 in past and future noneconomic damages to Salisbury and $270,000.00 in past and future loss of consortium damages to Theresa Salisbury. The jury found that Salisbury failed to mitigate damages, and that the amount of damages that were not avoided was $550,000.00. The jury found $157,448.29 for LEOFF benefits received, and $178,338.74 for LEOFF benefits Salisbury was eligible to receive in the future. The trial court reduced Salisbury's noneconomic damages by the total amount of received and receivable LEOFF benefits. The total amount awarded after reductions was $664,212.97. The Salisburys filed a motion for reconsideration, judgment as a matter of law, and to eliminate the offset against noneconomic damages. The superior court denied the motion.

The Salisburys appeal three decisions made by the trial court: (1) the trial court dismissed the Salisburys' claims for both past and future economic damages as a matter of law, (2) the trial court allowed the City to present a failure to mitigate affirmative defense, and (3) the trial court offset the noneconomic damages by the amount of LEOFF benefits Salisbury had received in the past, and the amount he was eligible to receive in the future.

7

II

We first review the superior court's CR 50 ruling dismissing Salisbury's claim for future economic damages and the ruling in which the court extended dismissal to his claim for past economic damages. The standard of review of a judgment as a matter of law is de novo. Paetsch v. Spokane Dermatology Clinic, PS, 182 Wn.2d 842, 848, 348 P.3d 389 (2015). Judgment as a matter of law is appropriate only when no competent and substantial evidence exists to support a verdict. Id. All evidence and reasonable inferences from the evidence must be viewed in the light most favorable to the nonmoving party, here, the Salisburys. Id. We conclude the Salisburys' evidence was sufficient to support submission of past and future economic damages to the jury.

A

In Bitzan v. Parisi, the court held when "there was testimony by plaintiff that he was still experiencing pain, suffering, disability, and loss of earnings at the time of trial," that testimony alone is sufficient to justify a jury instruction on future damages. 88 Wn.2d 116, 122-23, 558 P.2d 775 (1977). Applying its holding both to disability and "lost earnings," the court said, "The continued existence of these elements of damage at the time of trial permits a reasonable inference that future damage will be sustained." Id. at 122. Courts recognized a similar inference of future damage from the continued existence of past damage in Stevens and Leak. Stevens v. Gordon, 118 Wn. App. 43, 56, 74 P.3d 653 (2003) ("Ms. Stevens's testimony regarding lost earnings and reduced work capacity up to the time of trial permits a reasonable inference that future economic losses will be sustained.");

Leak v. U.S. Rubber Co., 9 Wn. App. 98, 102-3, 511 P.2d 88 (1973) (upholding recovery for future disability "because it could be inferred from the evidence that the petit mal seizures would continue for at least some time after the trial").

The reasonable probability of future damages may be based on lay testimony. See Bitzan, 88 Wn.2d 116. Bitzan stated there is no reason lay witnesses "may not testify to their sensory perceptions, the weight of the testimony to be determined by the trier of fact. . . . Furthermore, an injured person can testify to subjective symptoms of pain and suffering, and to the limitations of his physical movements." 88 Wn.2d at 121-22. Bitzan stated further, "[A] future damage instruction can be given even though there is no medical testimony, or even if the medical testimony is contrary to plaintiff's testimony." Id. at 122 (citation omitted).

The City argues that Bitzan should be viewed as limited to holding only that expert medical testimony is not required to support a claim for future economic damages. But the standard described in Bitzan is consistent with Washington decisions concerning the sufficiency of the evidence to support a future economic damages instruction. In Murray v. Mossman, the court affirmed that a plaintiff's testimony regarding her injuries and diminished capabilities at work and a coworker's testimony that corroborated her statements, were sufficient to warrant an instruction that allowed a jury to consider impairment of earning capacity. 52 Wn.2d 885, 889-90, 392 P.2d 1089 (1958). In Johnson v. Howard, where the plaintiff testified to his age and injuries, that he was unable to work as before, and that after each day work day he had extreme fatigue, the court held that "[t]his evidence is sufficient to sustain a jury finding of diminished earning power." 45

9

No. 82474-1-I/10

Wn.2d 433, 450, 275 P.2d 736 (1954).  The court reached this conclusion despite evidence that the plaintiff had not lost any income at the time of trial and had continued in his employment.  Id. at 439.  In Riddel v. Lyon, the court held that an injured party's testimony as to age and the nature of injuries could be "considered as evidence in determining whether his earning capacity has been impaired without the necessity of other testimony."  124 Wash. 146, 151, 213 P. 487 (1923).  These decisions support the conclusion that the existence of some evidence, even if limited to lay testimony, that a plaintiff suffers at the time of trial from disability affecting the plaintiff's ability to earn income is sufficient to submit future earnings loss to the trier of fact.

B

The City's arguments against Salisbury's future economic damages evolved over time, but generally asserted that Salisbury's evidence failed to give the jury a basis for determining future economic damages without resort to speculation.  Initially, the City argued that Salisbury's future economic damages claim failed because Salisbury did not put on expert evidence permitting the jury to discount future amounts to present value.  The City abandons this argument on appeal, and no Washington case has held that present value evidence is required as a condition of presenting a future damages claim.  In Bartlett v. Hantover, the court reversed a verdict because the instructions allowed the jury to consider the present value of future damages, but no evidence had been introduced of an appropriate interest rate permitting the jury to reduce future damages to present value.  84 Wn.2d 426, 432-33, 526 P.2d 1217 (1974).  The court held, "To instruct

10

the jury to reduce an award to present cash value without further defining what that term is and how it should be applied, is error." Id. at 432. But the court did not hold that the plaintiff was required to provide evidence of present value as a condition of making a claim for future economic damages.

What remains is the City's argument that the Salisburys' evidence was simply too scant to permit the jury to determine future economic damages. Washington courts have allowed the jury to consider future economic damages based on evidence less robust than the Salisburys'. Bartlett held, "certainty is not required in the area of proof of lost earning capacity." Id. at 432-33. When a three year old boy was severely injured, the court stated that while "it cannot be denied that the extent to which the earning capacity of [the child] has been impaired is highly uncertain," "[a]s to the extent of the impairment, we think that it was proper to permit the jury to make that determination." Sherman v. City of Seattle, 57 Wn.2d 233, 234, 245-46, 356 P.2d 316 (1960). While the City argues that exhibit 108 was insufficient to establish Salisbury's earnings for purposes of future economic damages, the court held otherwise in Stevens. 118 Wn. App. at 43. There, a manicurist estimated in her testimony the value of a week of work at $800. Id. at 57. This estimate was held to support a verdict for past economic damages of $1,200 based on missing one week and additional unspecified time for medical appointments, and for future economic damages of $3,000 based on the plaintiff's testimony she reduced her work schedule and would need future medical appointments. Id. at 49, 56-57.

11

No. 82474-1-I/12

Here, the City urged the trial court to view exhibit 108 as one data point, which the City urged was not sufficient to support a calculation of the reasonable value of Salisbury's economic loss. Exhibit 108 showed Salisbury's average monthly earnings, including overtime, for the 12 month period before the injury, from April 4, 2017 to April 3, 2018. The City challenges the evidentiary value of this exhibit, arguing that Salisbury was required to submit additional evidence pinpointing "how many days . . . Salisbury would have worked, how much he would have been paid on those days, and somehow account for overtime, hazard pay, and other factors."

The City cites no case demanding this level of precision in the estimation of what would likely have occurred if Salisbury had never been injured, nor does the City identify the "other factors" it says need to be demonstrated. While Salisbury's earnings as shown on exhibit 108 included both regular and overtime earnings, his reliance on a 12 month average to establish his earning potential at the time of injury was at least as reliable as the estimate that was held to be sufficient to submit the question of future economic damages to the jury in Stevens. To the extent the City contends exhibit 108 is not an accurate portrayal of Salisbury's future earning power, the City's argument is not directed at the sufficiency of Salisbury's evidence, but merely its credibility. The City remains entitled to argue to the trier of fact that exhibit 108 should not be accepted as proof of future earning potential, or to put on other evidence if any exists suggesting Salisbury would likely have gone on to work fewer days or less overtime if he had not been injured. But as to the sufficiency of Salisbury's evidence, proof of Salisbury's average earnings over

12

the 12 months leading up to his injury is some evidence permitting a trier of fact to assess the reasonable value of likely future earnings without speculation.

Salisbury's evidence also permitted the trier of fact to assess the reasonable value of likely future earnings based on reasonable estimates of the period over which Salisbury would likely have worked but for the injury. A future damages instruction requires only some evidence that the damage at issue will exist "for a period of time after the trial." Leak, 9 Wn. App. at 102 (distinguishing transient future disability from permanent future disability).[3] The period of time an injured person would likely have worked if the injury had never occurred cannot be determined other than by reasonable estimate. The Salisburys presented evidence including the rate at which Salisbury's salary typically increased year over year, Salisbury's plans to continue working, the debilitating nature of his injuries, and the City's admission that Salisbury's injuries prevented him from

---

[3] The parties invite us to address whether Salisbury's claim for future earnings loss is properly characterized as a claim for future "wage loss" or a claim for loss of "future earning capacity." The pattern jury instructions refer to claims for lost "earnings" and "earning capacity" (among other possible components). 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS; CIVIL 30.08.01, .02 (7th ed. 2022) (WPI). Washington decisions distinguish between loss of earnings due to injury and loss of earnings due to an injury permanently affecting a person's ability to work, defining "[i]mpairment of earning capacity" as the "permanent diminution of the ability to earn money." Murray, 52 Wn.2d at 889. Both elements may be appropriately submitted to the trier of fact depending on the evidence. Meissner v. City of Seattle, 14 Wn. App. 457, 461, 542 P.2d 795 (1975) ("In our opinion, the better approach is to distinguish loss of earnings from loss of earning capacity by instructing the jury that the award for one can only be given for a period of time different from that for which an award for the other is given, *if* both are awarded."). We decline to characterize the Salisburys' claim, because in reviewing the sufficiency of the evidence it is enough that the Salisburys' evidence would support a trier of fact in concluding Salisbury would likely have had future earning capacity that he did not have as a result of his injury.

13

working as a police officer at least through June 1, 2020. This evidence supported the inference that Salisbury would continue to incur economic loss in the future. Viewed in the light most favorable to the Salisburys, the evidence was sufficient to permit the jury to determine the reasonable value of future economic damages.

C

Our conclusion that exhibit 108 was sufficient evidence to support an assessment of the reasonable value of Salisbury's earning potential at the time of injury also answers the City's contention regarding past earnings loss. The City concedes that the issue is "not whether . . . Salisbury could not work from the date of his retirement through the date of trial." We presume the City here alludes to its admission before the trial court that Salisbury's injuries prevented him from working as a police officer because of his injury on April 10, 2018 until June 1, 2020. Salisbury's injury immediately prevented him from performing his employment for at least 25 months. When this was coupled with evidence of Salisbury's earnings level at the time of injury, there was sufficient evidence for a jury to determine past earnings loss. Further, in connection with the City's claim for an offset under RCW 41.26.281, the City later put on evidence that it paid benefits to Salisbury to replace income he lost among other economic losses as a result of his injury. Under CR 50 the City is entitled to a determination of the sufficiency of the evidence to support Salisbury's damages claims to the point when Salisbury rested at trial. There is nevertheless a certain artificiality in the City's argument that there was insufficient evidence that Salisbury had past

economic loss when that much was not substantially disputed at trial, and the City insisted it was entitled to an offset for paying precisely those losses.

Exhibit 108 showed Salisbury's average monthly earnings over the 12 month period before his injury. As to the sufficiency of exhibit 108 to support a trier of fact in assessing the reasonable value of Salisbury's earnings loss from the date of injury on April 10, 2018 forward, Stevens is dispositive and requires reversal. 118 Wn. App. at 57 (evidence sufficient to determine value of past earnings loss where plaintiff's testimony "estimated the value of her missed week of work.").

III

The standard of review of Salisbury's CR 50 motion challenging the sufficiency of the evidence to support an instruction on failure to mitigate is de novo. Paetsch, 182 Wn.2d at 848. We view the evidence in the light most favorable to the nonmoving party, on this issue, the City. Id. At the same time, "[w]hether to give a particular instruction to the jury is a matter within the discretion of the trial court." Stiley v. Block, 130 Wn. 2d 486, 498, 925 P.2d 194 (1996). " 'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.' " Terrell v. Hamilton, 190 Wn. App. 489, 499, 358 P.3d 453 (2015) (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). We conclude that many of the City's specific mitigation arguments were unsupported by substantial evidence. Accordingly, we vacate the verdict on the issue of mitigation and remand for proceedings consistent with this opinion.

15

No. 82474-1-I/16

A

This court has drawn a distinction between WPI 33.01, which describes a general duty to mitigate damages, and WPI 33.02, which describes the same general duty and contains an additional paragraph concerning whether a person should have secured or submitted to medical treatment. Helmbreck v. McPhee, 15 Wn. App. 2d 41, 59, 476 P.3d 589 (2020) (citing 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS; CIVIL 30.01, .02 (WPI)), review denied, 196 Wn.2d 1047, 481 P.3d 1097 (2021). In Helmbreck, the plaintiff relied on case law discussing the sufficiency of the evidence to support a mitigation defense based on the failure to submit to medical treatment, arguing that a mitigation defense requires evidence that such a failure aggravated the plaintiff's conditions or delayed recovery. Id. at 58-59. However, in Helmbreck, the trial court had given only WPI 33.01 on the general duty to mitigate, not WPI 33.02. Id. at 59. Based on this, the court limited its inquiry to asking whether the evidence at trial supported giving WPI 33.01. Id. at 59-60. Though not explicitly stated in the opinion, Helmbreck supports the conclusion that the thresholds of evidence required to give WPI 33.01 and WPI 33.02 lie at different places, and therefore must be analyzed separately when, as in this case, a court has given WPI 33.02.

When an alleged failure to mitigate concerns the plaintiff's failure to secure or submit to medical treatment, a defendant must show that there were alternative treatment options available to the plaintiff and that the plaintiff acted unreasonably in deciding on treatment. See Cox v. Keg Restaurants, 86 Wn. App. 239, 244, 935 P.2d 1377 (1997). "A wide latitude of discretion must be allowed to the person

16

who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss." Hogland v. Klein, 49 Wn.2d 216, 221, 298 P.2d 1099 (1956). An injured plaintiff making decisions about treatment options is held only to a standard of reasonableness. Id.

This court articulated the standard of proof required in Cox:

An injured party generally may not recover damages proximately caused by that person's unreasonable failure to mitigate. Expert testimony is required in cases where a determination of causation turns on obscure medical factors. Submitting the issue to the jury without such testimony is improper because the jury is thus invited to reach a result based on speculation and conjecture. The issue should also not be submitted if the evidence shows that a proposed treatment might not be successful or if there is conflicting testimony as to the probability of a cure, because it is not unreasonable for a plaintiff to refuse treatment that offers only a possibility of relief.

86 Wn. App. at 244 (citations omitted). A "mere possibility of a benefit" from a course of medical treatment is insufficient to warrant a failure to mitigate instruction. Id. at 245.

The defendant's burden of proof to establish failure to mitigate includes a causation component. There must be "expert testimony" to show that "reasonable alternatives were available." Fox v. Evans, 127 Wn. App. 300, 308, 111 P.3d 267 (2005). In Fox we explained, "To support a mitigation instruction, expert testimony must establish that the alternative treatment would more likely than not improve or cure the plaintiff's condition." Id. Expert testimony that the plaintiff's unreasonable failure to secure or submit to treatment that would more likely than not improve or cure the plaintiff's condition is necessary to give the jury a basis on which "to segregate the damages" between the damages proximately caused by the

17

underlying injury and the portion which was avoidable due to the failure to mitigate. See id. "This testimony is required so that the jury does not base its decision on speculation." Id.

In Cox, a restaurant patron suffered brain damage, including permanent memory loss, when he was assaulted by a fellow patron that the restaurant had served despite him being overly intoxicated. 86 Wn. App. at 242-43. We held there was insufficient evidence to show failure to mitigate. Id. at 244. First, a doctor testified that he felt it might have been useful to consider revising or eliminating the shunt in Cox's brain. Id. at 244-45. He did not testify to a reasonable degree of medical certainty that revision or elimination was necessary or would alleviate Cox's headaches. Id. at 245. Cox's neurosurgeon refused to make a judgment as to whether it was probable that a shunt revision would eliminate Cox's headaches. Id. Second, Cox did not take antidepressants or begin physical therapy as recommended by his doctor, but his doctor did not testify to a reasonable degree of medical certainty that these refusals prolonged Cox's recovery. Id. Instead, the doctor only affirmed that " 'it might [have] hasten[ed Cox's] recovery if he had followed through on [these] recommendations.' " Id. (alterations in original). Third, Cox did not consult a speech therapist until 18 months after he received a recommendation to do so, but his doctor did not testify that this delay prolonged his recovery, only that Cox could possibly have benefited by engaging in therapy earlier. Id. This court stated, "None of the evidence cited by [defendant] amounts to substantial evidence of an unreasonable failure to mitigate. [Defendant] points only to evidence of possibilities. . . . The court

18

therefore erred in submitting the mitigation issue to the jury." Id. at 246. Similarly, in Hawkins v. Marshall, we affirmed a refusal to give WPI 33.02 when the defendant presented evidence that the plaintiff failed to follow her doctor's advice to join the YMCA or to follow up for care, because the defendant "did not present testimony or other evidence that [plaintiff's] omissions aggravated her conditions or delayed recovery." 92 Wn. App. 38, 47-48, 962 P.2d 834 (1998).

In contrast, in Fox, we held it was appropriate to give a failure to mitigate instruction when multiple expert witnesses testified with a reasonable degree of certainty that Fox's condition would improve if she followed recommended courses of treatment, and provided precise predictions of how greatly Fox stood to benefit from treatment, which allowed the jury to segregate damages. 127 Wn. App at 309. Fox's primary care physician testified that Fox was depressed but refused to accept the diagnosis and did not want to try further antidepressants or therapy. Id. at 302. She stated that "Fox was worse off than she was when taking certain medications." Id. A neuropsychologist who treated Fox testified that "Fox had the potential for moderate improvement by taking medication." Id. A mental health counselor who treated Fox testified that he saw "a 30 percent reduction in [Fox's] stress reactivity" with treatment, and that "if she continued treatment, he anticipated an additional 50 percent improvement." Id. The defendant presented the testimony of a doctor who stated that "Fox could work full-time" and that "Fox could get back to 90 percent of her functioning if she would follow the treatment suggested by her doctors and therapists." Id. at 303. A second doctor testified for Evans, stating that "Fox did not have to be functionally impaired if she would take

19

medication and treat her psychological issues" and that " 'given some treatment . . . she would return to her baseline.' " Id.

As we explained in Fox, "In Cox, the only testimony presented regarding alternative treatments available to Cox was purely speculative and did not raise a debatable issue for the jury." Id. at 305-06. In contrast, in Fox, there was evidence that "Fox's refusal to treat her depression impeded her recovery" and that "Fox experienced significant improvement while taking certain medications and participating in therapy but that she discontinued these treatments." Id. at 306. The point distinguishing the cases is the existence of nonspeculative testimony, to a reasonable degree of medical certainty, that treatment would more likely than not have improved the plaintiff's condition.

The City's evidence was not sufficient to justify giving the WPI 33.02 instruction. Relevant to Salisbury's treatment, the City advances four theories of failure to mitigate to justify the verdict on appeal: (1) that Salisbury did not seek treatment often enough, (2) that he did not undergo written expressive theory (WET), (3) that he did not take psychiatric medication, and (4) that he and Theresa Salisbury did not also seek marital counseling. The City argues that "none of these issues turn on obscure medical testimony or evidence," but as to these contentions the City's argument is not consistent with Cox and Fox. No witness testified that Salisbury's obtaining any of the proposed treatments would, to a reasonable degree of medical certainty, more likely than not have led to any level of improvement. As a result, there was no evidence allowing the jury to reasonably

20

segregate any damages that could reasonably have been avoided if Salisbury had made different decisions about treatment.

As for mental health treatment, Dr. Benitez stated that he did not pursue treatments other than cognitive behavioral therapy with Salisbury, referring to that therapy as "the gold standard." Dr. Benitez did not pursue WET, because he did not think that WET would be beneficial for Salisbury, and he did not pursue medication because Salisbury, like many of his patients, did not want to be on medication. As for the City's arguments premised on the Salisburys' failure to seek couple's counseling, Dr. Benitez testified that he encouraged Salisbury to let him speak to Teresa Salisbury "to get her understanding of what his issues are." However, Dr. Benitez did not make a direct recommendation for them to engage in couple's counseling. Dr. Benitez did not testify, and the City did not offer other evidence, that couple's counseling would have eliminated or decreased the effects of Salisbury's injuries on the Salisburys' marriage.

The absence of evidence that proposed treatment would, to a reasonable degree of medical certainty, more likely than not have led to improvement forecloses giving the WPI 33.02 instruction. To the extent the City's failure to mitigate defense was based on an alleged failure to secure or submit to medical treatment, the denial of Salisbury's CR 50 motion was error.[4]

---

[4] The City argued in the trial court that Salisbury acted unreasonably in not seeking a second opinion or treatment for peripheral arterial disease, the diagnosis that was made by the City's witness, Dr. James, and disputed by Salisbury's treating physician, Dr. Schuster. In the absence of evidence that Salisbury had access to Dr. James's opinion when making health care decisions, the later opinion would not support a conclusion of unreasonableness by Salisbury at the time he made the relevant decisions. In any event, the City does not appear to pursue the

B

The City also relies on three arguments it grounds in the general duty to mitigate stated in WPI 33.01 (which was not given) and the first paragraph of WPI 33.02 (which was given). These arguments are that Salisbury unreasonably failed to mitigate by: (1) allowing six months to pass between his first visit to Dr. Schuster and his second, (2) failing to follow an exercise routine, and (3) failing to engage in workplace accommodation or vocational rehabilitation. As in Helmbreck, it is necessary to evaluate whether the City's evidence on these points was sufficient to justify the giving the WPI 33.01 instruction. 15 Wn. App. 2d at 59-60.

In Helmbreck, evidence was presented that allowed a jury to conclude the plaintiff's activities separate from the injury at issue had worsened, or perhaps caused by themselves, many of the plaintiff's claimed conditions. Id. at 62. There, the plaintiff was injured in a June 7, 2015 vehicle collision from which he felt pain in his tailbone the same afternoon. Id. at 46, 60. After the collision, the plaintiff went to the gym three times a week, playing basketball and lifting weights. Id. Two months after the collision, the plaintiff reported pain running down his leg and was found to have disc damage and inflammation in his back. Id. The plaintiff reported that he had not had pain running down his legs in the days after the collision. Id. Over the remainder of 2015 and 2016, the plaintiff engaged in football with his college fraternity, basketball, and gym workouts. Id. at 60-61. Medical providers

"second opinion" theory on appeal. The City mentions that Salisbury was asked in a juror question "if he ever sought a second opinion after Dr. Schuster told him he could never work or volunteer, and he testified that he did not." Other than this mention, the City does not argue in its brief that the mitigation portion of the verdict should be sustained based on an alleged failure to obtain a second opinion.

advised the plaintiff to limit certain activities and it appears to have been disputed whether he did so. See id. The plaintiff's physician testified that disc herniations can result from varied causes, and in the absence of reported symptoms within two weeks of the collision it would be "unlikely" the herniation occurred on the day of the collision. Id. at 62. We held this evidence "could allow a jury to conclude that Helmbreck's injury was aggravated by his subsequent actions and activities." Id.

We therefore ask here whether the City's evidence properly allowed the jury to conclude that Salisbury's condition was aggravated by any of the asserted failures to mitigate the City advances. With regard to the six months between the first two visits to Dr. Schuster, Dr. Schuster did not testify to any deficiency resulting from this. With regard to the gap in treatment, Dr. Benitez testified "I can say with certainty that he didn't get better during [the gap in treatment], but it doesn't really seem like he got worse during that time." The assertion that Salisbury should have seen a doctor in this period is indistinguishable from a claim that Salisbury failed to obtain treatment, must be presented under WPI 33.02, and fails because, as stated above, the City presented no evidence that Salisbury's obtaining the proposed treatment would more likely than not have led to an improvement in his condition that the jury could segregate. Likewise the City presented no evidence that Salisbury's not seeing a doctor in this period aggravated his condition.

Although the City showed Salisbury did not pursue vocational rehabilitation or workplace accommodation, and that he could have exercised more, the record is much less clear that these amounted to a failure to exercise reasonable care or

23

was responsible for any portion of damages that could have been avoided. The City is correct when it argues "the jury could simply have not believed Dr. Schuster's testimony and thought . . . Salisbury was capable of doing some job in the future." But this confuses the City's defense of Salisbury's claim with the City's own burden of proof to establish its mitigation defense. On the City's affirmative defense, it is not enough for the City simply to argue the jury was entitled to disbelieve Salisbury's evidence, because the City had the burden of proof to establish a failure to exercise reasonable care by Salisbury and a basis on which any avoidable damages could be segregated. See Fox, 127 Wn. App. at 305 ("Because the defendant caused the injury . . . it is the defendant's burden to show that the plaintiff acted unreasonably.").

The City points to testimony by its witness Dr. James that Salisbury's condition was treatable. This logically supports the inference that Salisbury could pursue some employment. And with respect to an exercise regimen, while Dr. Schuster testified that Salisbury was "compliant with whatever was asked of him" in response to a juror asking whether Salisbury was "good at exercising and following directions. . . postincident," Salisbury's own testimony acknowledged relatively limited efforts at establishing an exercise routine. However, under the terms of WPI 33.01, establishing failure to mitigate requires two elements. It first requires evidence that the injured party failed to exercise reasonable care. See Helmbreck, 15 Wn. App. 2d at 59 ("WPI 33.01 correctly allocates the burden of proof.") (citing Sutton v. Shufelberger, 31 Wn. App. 579, 582, 643 P.2d 920 (1982)). Failure to exercise reasonable care refers to the negligence standard.

24

See WPI 10.01 cmt. (citing Sys. Tank Lines v. Dixon, 47 Wn.2d 147, 151, 286 P.2d 704 (1955)). In Helmbreck, there was evidence that the plaintiff had not followed medical advice to limit certain activities. 15 Wn. App. 2d at 61. Second, there must be evidence that the failure to exercise reasonable care aggravated the injured person's condition or delayed recovery. In Helmbreck, there was evidence that the plaintiff's activities separate from the injury attributed to the defendants could have aggravated or caused on their own the condition for which the plaintiff claimed damages. Id. at 62. In contrast, where a plaintiff failed to follow medical advice, but there was no evidence of a resulting aggravation of the plaintiff's condition or delayed recovery, we held that a mitigation instruction was not supported. Hawkins, 92 Wn. App. at 47-48.

We agree with the City that under Helmbreck, these are circumstances that a jury could conclude aggravated a plaintiff's condition within the scope of WPI 33.01, as opposed to the specialized provisions of WPI 33.02. However, we stop short of concluding that the City's evidence allowed that conclusion here.

The record does not disclose direct evidence of how the City envisioned that the jury could rationally segregate the portion of Salisbury's damages that was avoidable through Salisbury's seeking alternate employment or a more regular exercise routine. The City put on no evidence of any employment that would more likely than not have resulted from either accommodation or vocational services, based on Salisbury's education, training, experience, and limitations. In light of our conclusion that we must remand on the issue of economic damages, and in light of our conclusion that several of the City's mitigation arguments were

25

unsupported by substantial evidence, we conclude that we must vacate the portion of the verdict finding failure to mitigate. Given that conclusion, we leave to the trial court to determine on remand based on the standards set forth in this opinion whether some of the City's mitigation arguments may be cognizable under WPI 33.01 on retrial.

IV

We hold the superior court correctly applied RCW 41.26.281 in offsetting the Salisburys' total award by the amount of Salisbury's LEOFF benefits. Questions of statutory construction are reviewed de novo. City of Pasco v. Pub. Emp't Rels. Comm'n, 119 Wn.2d 504, 507, 833 P.2d 381 (1992). This court construes statutory language according to its plain and ordinary meaning. Flanigan v. Dep't of Lab. & Indus., 123 Wn.2d 418, 426, 869 P.2d 14 (1994).

A

The legislature enacted the LEOFF in 1969. Fray v. Spokane County, 85 Wn. App. 150, 154, 931 P.2d 918 (1997), aff'd, 134 Wn.2d 637, 952 P.2d 601 (1998). The Act provides a comprehensive system of benefits for police officers and fire fighters, and abolishes civil actions against government employers except as provided for in the chapter. Id.; RCW 41.26.270. The legislature amended the Act in 1971 to provide additional benefits, including the right to sue an employer for negligence. Id. The right to sue is currently codified in RCW 41.26.281, which permits an injured officer or fire fighter to sue for "any excess damages":

> If injury or death results to a member from the intentional or negligent act or omission of a member's governmental employer, the member, the widow, widower, child, or dependent of the member shall have

26

the privilege to benefit under this chapter and also have cause of action against the governmental employer as otherwise provided by law, for any excess of damages over the amount received or receivable under this chapter.

Salisbury argues that his recovery for general damages should not have been subject to the setoff for LEOFF benefits. Salisbury reasons that because the LEOFF benefits he received did not explicitly compensate him for general damages—as opposed to economic loss due to his injury in the line of duty—it follows that any general damages found by the jury are by definition in "excess" over the LEOFF benefits he received. Salisbury acknowledges that this argument was rejected in Gillis v. City of Walla Walla, where the court held "the value of benefits received and the present value of benefits receivable under the chapter are to be offset against the gross verdict." 94 Wn.2d 193, 198, 616 P.2d 625 (1980). Salisbury contends that we should conclude Gillis is no longer good law. For the reasons that follow, we decline to do so.

B

In Gillis, the injured LEOFF beneficiary argued that he was entitled to receive amounts for "pain, suffering, disability and disfigurement" free of any setoff for LEOFF disability pension benefits, because the LEOFF law did not "specifically mention[ ]" those losses as ones it was compensating. 94 Wn.2d at 196. The court provided two reasons for its conclusion that all components for personal injury are subject to the setoff for LEOFF benefits. Id. The first reason started from the premise that "[t]o the extent" LEOFF provides "disability benefits," the LEOFF benefit "represents compensation for all components attendant to an injury, including both economic and non-economic (i. e., pain, suffering, disability and

27

disfigurement) loss." Id. The court described this as being "like workman's compensation benefits." Id. Gillis reasoned from this premise that it would be wrong to say the general damages were exempt from the setoff, because, if that were true, "only members who were injured as a result of an employer's improper act would be entitled to damages for pain, suffering, disability and disfigurement," and "[m]embers who were not so injured would only be entitled to benefits for economic loss." Id. at 197. The court said this result could not be the correct interpretation, because "[n]othing in the act indicates such a distinction was contemplated," and, in contrast, the purpose of the law was "to confer benefits without reference to the negligent or non-negligent character of the source of injury." Id. The second reason given by the court for its conclusion was that the LEOFF law was also designed to provide "protection for the employer from actions at law," and failing to offset general damages by amounts received under the law would subject employers to "constant exposure to legal action" and "destroy[ ] the clear legislative policy" of the law. Id. at 197-98.

1

Salisbury argues that the reasoning of Gillis is today foreclosed by two subsequent Supreme Court decisions. In the first, Flanigan, workers in two consolidated matters suffered on the job injuries from which they died, for which one worker received benefits under the Industrial Insurance Act, title 51 RCW, before death and both workers' spouses received surviving spouse benefits after the workers' deaths. 123 Wn.2d at 420-22. Both surviving spouses made

28

recoveries from at-fault third parties that included compensation for the spouses' loss of consortium. Id.

The Industrial Insurance Act is based on a compromise between workers and employers, under which workers become entitled to speedy and sure relief, while employers are immunized from common law responsibility. RCW 51.04.010; Flanigan, 123 Wn.2d at 422. The compromise abolishes most civil actions arising from on the job injuries and replaces them with an exclusive remedy of workers' compensation benefits. Flanigan, 123 Wn.2d at 422. As an exception to the Industrial Insurance Act's abolition of civil actions, the legislature enacted chapter 51.24 RCW, authorizing employees and their beneficiaries to increase their compensation by suing third parties under traditional tort principles. RCW 51.24.030; Flanigan, 123 Wn.2d at 424. The recovery is required to be distributed between the injured parties, their counsel, and the State according to a statutory formula. RCW 51.24.060(1)(a)-(d); Flanigan, 123 Wn.2d at 424. The purpose of allowing the State to share in the recovery is to provide for "reimbursement" to the State for Industrial Insurance Act benefits, both to ensure the State does not pay for losses caused by a third party and to ensure injured workers do not " 'make a double recovery.' " Flanigan, 123 Wn.2d at 425 (quoting Maxey v. Dep't of Lab. & Indus., 114 Wn.2d 542, 549, 789 P.2d 75 (1990)).

In Flanigan, the court held that the injured workers' spouses' recoveries for loss of consortium damages should not be included in the statutory formula for reimbursement to the State. Id. at 425. This was because the payment of benefits under the Industrial Insurance Act "[did] not cover damages for loss of consortium."

29

Id. The Industrial Insurance Act compensated for "certain damages," and the recovery for loss of consortium compensated for "separate damages." Id. Allowing the State to claim reimbursement from a recovery for which it had never paid both would not go to preventing a "double recovery," and would "give an unjustified windfall to the State." Id. A dissenting opinion in Flanigan would have applied Gillis, arguing that "[u]nder the majority's rationale, only those injured by liable third parties would be able to receive compensation for noneconomic losses." Id. at 439 (Madsen, J., dissenting) (citing Gillis, 94 Wn.2d at 197-98). The Flanigan court's holding that the Industrial Insurance Act compensates only "certain damages," 123 Wn.2d at 425, contrasts with Gillis's holding that LEOFF compensates "all components attendant to an injury," 94 Wn.2d at 196.

In the second Supreme Court decision Salisbury relies on as having undermined Gillis, the court extended the reasoning of Flanigan to general damages of the injured worker. In Tobin v. Department of Labor & Industries, an injured worker received Industrial Insurance Act benefits consisting of time loss, medical benefits, and, because he was " 'totally and permanently disabled,' " pension benefits. 169 Wn.2d 396, 398, 239 P.3d 544 (2010). The worker received a settlement from an at-fault third party, a portion of which was categorized as pain and suffering. Id. The court characterized Flanigan as holding that where the State "[had] not paid out benefits for a type of damages, it cannot seek reimbursement from that type of damages." Id. at 401. Because the Industrial Insurance Act benefits involved "only a percentage of salary" without referencing "any other category of damages," the court concluded the benefits did not

compensate pain and suffering "any more than" they did loss of consortium.  Id. at 402.

Salisbury argues that Flanigan and Tobin undercut the reasoning of Gillis's first justification for subjecting general damages to the setoff for LEOFF benefits. Salisbury relies on a footnote in Flanigan disapproving "dictum to the contrary" in Gillis.  123 Wn.2d at 423 n.3.  Salisbury argues that the Flanigan footnote signals an intent to disapprove the reasoning of Gillis.  We find the disapproval is more limited, and, unhelpful to Salisbury, requires that the Industrial Insurance Act and LEOFF must be analyzed independently.  Flanigan explained that Industrial Insurance Act benefits calculated as a lesser percentage of the injured worker's salary and covering only "a portion of lost wages" "by their very nature do not provide full compensation for the damages incurred."  123 Wn.2d at 423.  The specific sentence to which the footnote is appended stated, "[The Industrial Insurance Act benefits so calculated] cannot take into account noneconomic damages, such as an employee's own pain and suffering or a spouse's loss of consortium."  Id.  The footnote disapproves "dictum to the contrary" in Gillis, explaining that Gillis was "a case construing [LEOFF], not the Industrial Insurance Act."  Id. at 423 n.3.

What Flanigan disapproved in Gillis was its statement in "dictum" purporting to characterize the nature of Industrial Insurance Act benefits—not Gillis's holding about LEOFF benefits.  Flanigan explained that Industrial Insurance Act benefits did not include general damages because of the specific way they were calculated and what they were found to cover.  But it would not follow that LEOFF benefits

31

calculated differently and covering other things would be, as <u>Gillis</u> states, "like [Industrial Insurance Act] workman's compensation benefits," or that Industrial Insurance Act benefits in turn would compensate the same things as LEOFF benefits. 94 Wn.2d at 196. The only aspect of the statement in <u>Gillis</u> that can be characterized as "dictum" was its statement that its characterization of LEOFF benefits was "like" Industrial Insurance Act benefits. Industrial Insurance Act benefits, and the related statutory language, were not before the court in <u>Gillis</u>, and commenting on them would qualify as "dictum." On the contrary, the statement in <u>Gillis</u> that LEOFF benefits compensated for losses equivalent to general damages was not dictum but the main premise of its first rationale for subjecting the entire verdict to the setoff.

This court adopted this reading of <u>Gillis</u> in <u>Bickford v. City of Seattle</u>, 104 Wn. App. 809, 815, 17 P.3d 1240 (2001). The claimant in <u>Bickford</u> also argued that general damages should not be subject to the LEOFF setoff, basing his argument "on a footnote in the decision of <u>Flanigan v. Department of Labor & Industries</u>, making a negative reference to dictum in <u>Gillis</u>." <u>Id.</u> This court rejected the argument, explaining "<u>Flanigan</u>, an industrial insurance benefit case, cannot be read to overturn <u>Gillis</u>, or one that applies to the offset of LEOFF benefits under RCW 41.26.270. The <u>Flanigan</u> decision disapproves of the homogenization of industrial insurance benefits with LEOFF disability benefits but does not overturn the <u>Gillis</u> decision." <u>Id.</u> (footnotes omitted). This is consistent with the conclusion that <u>Flanigan</u>'s only disapproval of <u>Gillis</u> was to the extent of <u>Gillis</u>'s saying that its

32

conclusions about LEOFF benefits made them "like" Industrial Insurance Act benefits.

This court has cited Gillis as good law in other decisions. In Locke v. City of Seattle, this court cited the offset rule as established in Gillis, in the context of holding that RCW 41.26.281 satisfied constitutional rational basis review in making employers in the LEOFF system subject to employee negligence claims, but not employers subject to the Industrial Insurance Act. 133 Wn. App. 696, 709, 137 P.3d 52 (2006), aff'd, 162 Wn.2d 474, 172 P.3d 705 (2007). The court described Gillis as "overruled on other grounds." Id. In Hansen v. City of Everett, the question was whether an injured LEOFF beneficiary's recovery would be reduced for comparative fault before the LEOFF setoff was applied to the verdict, or after the setoff was applied. 93 Wn. App. 921, 927, 971 P.2d 111 (1999). Hansen interpreted the LEOFF statute as establishing a statutory claim allowing a recovery for the "excess damages," and concluded the comparative fault percentage could be applied only after the LEOFF setoff because the "excess damages" was the only recoverable remedy. Id. at 928.

Locke and Hansen do not speak directly to the issue in this case, which requires characterizing the nature of the "excess" recovery allowed by RCW 41.26.281. But Hansen shows that the LEOFF statute is not subject to the same analysis on which Flanigan and Tobin relied. Flanigan placed particular emphasis on the meaning of the statutory term "reimbursement," which provided the basis for the State to share in a third party recovery. 123 Wn.2d at 426. Relying on a definition of "reimbursement" as " 'to pay back,' " the court explained, "One cannot

be 'paid back' compensation one never paid in the first place." Id. Tobin relied on the meaning of "reimburse" in rejecting the proposition that intervening legislative amendments prevented the application of Flanigan beyond loss of consortium recoveries. 169 Wn.2d at 402. The language of RCW 41.26.281 does not contain the term "reimbursement," so an effort to interpret the language analogously to Flanigan and Tobin lacks the benefit of the definition of "reimbursement" on which those decisions relied. In holding that the LEOFF right to sue provision establishes a unique statutory claim for "excess damages," Hansen distances RCW 41.26.281 from the analysis of Flanigan and Tobin. In light of Flanigan's distinction between Industrial Insurance Act benefits and LEOFF benefits, and this court's decisions in Bickford, Hansen, and Locke, we are unable to conclude that Flanigan disapproved the reasoning of Gillis as applied to the LEOFF statute.

2

Salisbury further argues that we can no longer rely on the starting premise of Gillis, that LEOFF benefits compensate for "all components attendant to an injury," including noneconomic losses consisting of "pain, suffering, disability and disfigurement." 94 Wn.2d at 196. There is no question that Flanigan and Tobin reject such an interpretation of the Industrial Insurance Act. Tobin rejected the argument, as inconsistent with Flanigan, that "the statute should be viewed broadly rather than separated into damage types." Tobin, 169 Wn.2d at 403. This foreclosed the argument by the State that the injured worker's lifetime pension "may be viewed as representing more than medical expenses and lost wages." Id.

Salisbury asks for a like conclusion in regard to his LEOFF benefits. Salisbury's benefits are different from those that were at issue in Gillis and in Bickford. In 1977, the legislature amended LEOFF to restrict certain benefits provided to law enforcement officers and fire fighters employed after September 30, 1977. See LAWS OF 1977, 1st Ex. Sess., ch. 294, § 1. It did so by creating two classes of members. Fray, 85 Wn. App. at 155. Plan I included those members employed on or before September 30, 1977, and Plan II included those employed after that date, including Salisbury. Id. Plan II members became eligible for Industrial Insurance Act benefits. Id. Salisbury argues that even if past decisions concluded LEOFF benefits were viewed as compensating all components attendant to an injury, that is not an accurate characterization of Salisbury's LEOFF benefits, which are like the benefits at issue in Flanigan and Tobin. Despite the distinction between the available benefits, we nevertheless conclude that we must follow Gillis's interpretation of the unchanged language of RCW 41.26.281.

Gillis and Bickford involved a Plan I benefit. In Gillis, the claimant received "a LEOFF disability pension" under RCW 41.26.120 and .130. 94 Wn.2d at 194. The parties stipulated that the then present value of receivable LEOFF benefits was $131,860.00. Id. The jury awarded $11,500.00 for medical expenses, $10,000.00 for disability and disfigurement, $50,000.00 for pain and suffering, and nothing for loss of earnings and earning capacity. Id. The claimant's disability pension was based on the claimant having a "disability incurred in the line of duty" and is today categorized as a Plan I benefit. RCW 41.26.075, .120. The claimant received the pension notwithstanding the jury's apparent conclusion that he lost

35

no earnings as a result of his injury. Gillis, 94 Wn.2d at 194. In Bickford, the claimant was "was granted disability retirement" that the court characterized as allowing the claimant a "disability pension." 104 Wn. App. at 812, 815.

Salisbury's benefits were more limited. The City put on evidence that Salisbury received benefits primarily covering economic loss that the City agreed was the result of his injury. The City introduced evidence Salisbury had received $157,448.29 in time loss payments between the date of his injury and the time of trial. The City also introduced evidence that the value of Salisbury's permanent partial disability award for loss of use of his leg below the knee joint had a maximum value of $96,575.97.

Salisbury's benefits included an amount explicitly covering disability. And while the legislature has limited the LEOFF benefits compared to what was available to the claimants in Gillis and Bickford, the legislature has not altered RCW 41.26.281. As a result, and because we conclude Gillis has not been disapproved by the Supreme Court, we must apply the setoff as Gillis directs.

3

Salisbury does not address the second reason that Gillis gave for holding that general damages recovered under RCW 41.26.281 are subject to the setoff. According to the court, applying the setoff to general damages recoveries was necessary to provide protections to LEOFF employers from damages claims. 94 Wn.2d at 197-98. This rationale, too, stands in contrast with the Supreme Court's interpretation of the Industrial Insurance Act. Once the court concluded that the Industrial Insurance Act compensated only certain damages and that the State's

reimbursement rights were limited to recoveries for those damages, the court did not find that concerns about the financial consequences to the workers' compensation system overcame the result of that statutory interpretation. Tobin rejected both the risk of settlements collusively allocating excessive amounts to pain and suffering and concern for the "solvency" of the Industrial Insurance fund as reasons to permit the State to seek reimbursement from third-party recoveries for pain and suffering. 169 Wn.2d at 403-04.

We remain bound by Gillis's rationale, including its conclusion that the setoff must be applied as a guard against the liability exposure of employers covered by LEOFF. While sharing points of comparison, the solvency of the Industrial Insurance fund and the potential liability of LEOFF employers are driven by different concerns. The reason LEOFF employee fire fighters and police officers may sue their employers is "because of the vital and dangerous nature of their work." Hauber v. Yakima County, 147 Wn.2d 655, 660, 56 P.3d 559 (2002). At the same time, it may be important that LEOFF benefits are "more inclusive" than Industrial Insurance Act benefits, Bickford, 104 Wn. App. at 815 n.9, because despite the hazardous work LEOFF beneficiaries perform, they at times face common law restrictions on suits that others do not. Estate of McCartney v. Pierce County, 22 Wn. App. 2d 665, 678-96, 513 P.3d 119, review denied, 200 Wn.2d 1014, 519 P.3d 590 (2022) (applying discretionary immunity and the professional rescuer doctrine to claims brought by estate of sheriff's deputy killed in the line of duty). Washington decisions consistently separate the Industrial Insurance Act and LEOFF, as a result of which we must apply Gillis.

V

We reverse the dismissal of the Salisburys' claims for past and future economic damages. We vacate the portion of the verdict finding failure to mitigate. We affirm the trial court's decision to offset the Salisburys' total award by the amount of LEOFF benefits received and receivable. No party asks us to disturb the jury's determination of noneconomic damages and we do not do so. We remand for proceedings consistent with this opinion.

_Birk, J._

WE CONCUR:

_Chung, J._           _Hazelrigg, J._